YU G. KE, Shu Hua Chen, Jian L. Lin, Bao J. Chen, Guo Q. Chen, Jian Y. Chen, Jie Chen, Ming H. Chen, Shu Hui Chen, Shu Jian Chen, Shu Jin Chen, Wen D. Chen, Wen Z. Chen, Xian Y. Chen, Xiang Y. Chen, Guo Q. Chen, De S. Chi, Lian G. Chi, Zhao Y. Dong, Xue Y. Huang, Bing X. Li, Qiang H. Li, Qi H. Lian, Li Q. Lin, Ming Lin, Xin W. Lin, Yi L. Lin, Boa G. Xie, De K. Xie, Mu L. Xie, Rui G. Xie, Zhi G. Xie, Rui H. You, Yu M. Yu, Wen R. Zheng and Yu X. Zhou, Plaintiffs,

v.

SAIGON GRILL, INC., Saigon Gourmet Restaurant Inc., Saigon Spice Inc., Saigon Brasserie Inc., Saigon West Inc., Simon Nget a/k/a Chang S. Nget, Michelle Lu Nget a/k/a Pei Ying Nget, Leana Nget, Richard K. Nget a/k/a Chang Hao Nget, and Sung Truong, Defendants.

No. 07 Civ.2329(MHD), 07 Civ.2329 (MHD).

United States District Court, S.D. New York.

Oct. 21, 2008.

Edward Sherwin, Matteo Joshua Rossel-
lo, Jonathan L. Adler, Ronnie Abrams,
Davis, Polk & Wardwell, Kenneth Kimer-

ling, Puerto Rican Defense & Education Fund, Inc., William Ross Miller, Jr., Davis Wright Tremaine LLP, New York, NY, for Plaintiffs.

S. Michael Weisberg, Weisberg & Weisberg, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge.

This lawsuit was filed by thirty-six men who worked during portions of the period from 1999 to 2007 for one or several restaurants in Manhattan known as Saigon Grill. All but one of the plaintiffs served as delivery men for the restaurants, and the remaining plaintiff worked in one of the restaurants as a delivery packer. (JPTO 10 at ¶ 25). They sue four corporations that, on paper, owned one or all of the Saigon Grill restaurants; the conceded owner of the restaurants, Simon Nget; his wife, Michelle Nget; and two other individuals—Leana Nget (Simon's sister) and Sung Truong—who plaintiffs allege had some managerial responsibilities at the various restaurants.[1]

*Plaintiffs' Claims*

Plaintiffs all assert claims for denial of minimum wages and overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 206 & 207(a)(1). As an accompaniment to their minimum-wage and overtime claims, they also allege that they were victimized by unlawful deductions from their wages in the form of "fines" and kickbacks to defendants, 29 C.F.R. § 531.35, and that they are entitled to reimbursement for the expenses of their bicycles and motorcycles, which they characterize as tools of their trade. *Id.* Finally, some press claims for retaliatory termination, in violation of 29 U.S.C. § 215(a)(3).

Plaintiffs assert a parallel set of claims under New York law. Thus they complain that defendants violated their rights to a minimum wage and overtime under N.Y. Labor Law §§ 652(4), 650 and N.Y.C.R.R. tit. 12, §§ 137–1.3 & 1.4. They further assert claims for unlawful deductions under N.Y. Labor Law §§ 193, 198–b, and seek "tools of the trade" reimbursement under N.Y.C.R.R. tit. 12, § 137–2.5. In addition, they assert a claim for "spread of hours" compensation under N.Y.C.R.R. tit. 12, §§ 137–1.7, 142–2.4, for workdays on which the time between the start and end of their work exceeded ten hours. Finally, some of the plaintiffs assert a claim under N.Y. Labor Law § 215 for retaliatory termination.

For relief under federal law, plaintiffs seek compensatory and liquidated damages for denial of minimum wage and overtime, attorneys fees and costs, as well as punitive damages for the retaliation claim.[2] 29 U.S.C. §§ 216(b), 215(a)(3).[3] Under state law they seek equivalent forms of relief as well as "spread of hours" compensation. *See* N.Y. Labor Law §§ 198, 215.

*Trial Proceedings*

We conducted a trial on all issues except for damages accruing because of alleged

---

1. Plaintiffs originally also named two other defendants, Saigon Brasserie and Richard Nget, both of which plaintiffs agreed to drop before trial. (JPTO at 7).

2. Plaintiffs listed punitive damages in the complaint as a remedy for their claims of retaliation. (Compl. ¶ 69). However, because the relief portion of the retaliation claim has been bifurcated and postponed to a

second stage of this proceeding, punitive damages were not sought at trial. (Tr. 5).

3. Although the plaintiffs also originally sought injunctive relief to restore those unlawfully terminated to their former jobs, it appears that this claim for relief has been mooted by the recent reinstatement of all terminated employees who wanted to return.

retaliatory terminations. As to that issue, at plaintiffs' suggestion, we deferred any hearing until a date to be set after the trial on all other issues. (Tr. 5).

Trial commenced on June 23, 2008, and ended on June 27, 2008. Post-trial briefing was invited and received from both sides. On the basis of the record before me, which includes live testimony at trial, affidavit testimony from most of the plaintiffs and documentary evidence, I make the following findings.

*The Facts*

Simon Nget is a Cambodian refugee, who entered this country as a teenager. (Tr. 342). He graduated from high school and attended at least 3 semesters of college. (Tr. 342, 381). He worked for a period of years as a packer, a waiter's helper and then a waiter in New York City. (Tr. 343). In about 1991 he opened his first food establishment, a coffee shop in Astoria, Queens. (Tr. 343–44). In January 1996 he opened his first full-scale restaurant, named Saigon Grill, at Broadway and 87th Street. (Tr. 344; JPTO 9 at ¶ 11). In March 1999, he opened a second restaurant, also named Saigon Grill, on Second Avenue and 88th Street (the "East Side" Saigon Grill). (Tr. 344; JPTO 8 at ¶ 5). In August 2001, because of the success of the Broadway Saigon Grill, he moved the location of that restaurant to a larger site at Amsterdam Avenue and 90th Street, allowing him to expand substantially the seating capacity of the restaurant. (Tr. 344, 383; JPTO 9 at ¶ 14). As for the East Side Saigon Grill, he closed it in July 2006 and reopened that restaurant at a larger location on University Place and 12th Street (the "University Place" Saigon Grill). (Tr. 344–45; JPTO 8 at ¶ 8).

Simon Nget owned these various restaurants through a network of corporations that he and his wife, Michelle Nget, incorporated and controlled.[4] He and his wife directly managed the operations of the restaurants, including hiring and firing of staff, determination as to compensation, and on-site supervision of operations and staff performance.[5] Since these two defendants owned two restaurants at all times during the relevant period, they also called upon several others to assist in performing managerial functions. In particular, a friend of Simon Nget named Sung Truong, who was known to restaurant employees as "Tony" (Tr. 432), was assigned to oversee the operations of the East Side Saigon Grill from February 2002 until it closed in July 2006, and has since served in the same capacity at its replacement location on University Place. (Tr. 433–34). It does not appear that Sung Truong had responsibility to set pay, though he did hire and occasionally fire staff.[6] He close-

4. The Broadway restaurant was owned by West Saigon Inc., and its Amsterdam Avenue successor is owned by Saigon Gourmet Restaurant Inc. The original East Side restaurant was owned by Saigon Grill Inc., and the University Place location is owned by Saigon Spice Inc. (JPTO 8–9 at ¶¶ 5, 8, 11 & 14).

5. *See, e.g.,* JPTO 9 at ¶ 20; Tr. 403, 25, 32, 45, 47–48, 52, 58, 77, 79–80, 122, 135–36, 142, 150, 155–56, 163, 167, 170, 174, 176, 185, 192–96, 199, 206, 211, 230, 246–47, 250, 255, 257, 265, 270–71, 275, 283, 299, 303–04, 307–08, 312–13, 318, 321, 328; Guo Jin Chen. Aff. ("PX 19") ¶ 23; Wen Da Chen Aff. ("PX 37")

¶ 23; Bao Guo Xie Aff. ("PX 14") ¶¶ 26–27; Bao Jian Chen Aff. ("PX 15") ¶ 22; Jian Le Lin Aff. ("PX 21") ¶ 20; Lian Guan Chi Aff. ("PX 25") ¶ 21; Ming Hua Chen Aff. ("PX 26") ¶ 17; Mu Lei Xie Aff. ("PX 28") ¶ 20; Shu Hui Chen Aff. ("PX 34") ¶ 22; Xue Yong Huang Aff. ("PX 43") ¶ 23; Yu Ming Yu Aff. ("PX 46") ¶ 23; Yu Xing Zhou Aff. ("PX 47") ¶ 24; Qi Hua Lian Aff. ("PX 29") ¶ 22; Shu Jian Chen Aff. ("PX 35") ¶ 19; Jian Yun Chen Aff. ("PX 22") ¶ 25.

6. *E.g.,* Tr. 114, 135, 181, 196, 218, 265, 329; Jie Chen Aff. ("PX 23") ¶ 17; Xian Yi Chen

ly supervised the performance of employees at his location and was in any event in a position to influence decisions as to hiring and firing.[7] In addition, Simon Nget's sister, Leana Nget, performed some limited managerial functions for portions of the day at the West Side Saigon Grill, including assigning some miscellaneous tasks to the deliverymen when they were not out delivering and overseeing the delivery operations.[8]

Simon Nget spent the majority of his time at the West Side Saigon Grill, although he also traveled on a regular basis to the other Saigon Grill location to review the books, discuss staff issues with Sung Truong and deliver cash for payment of wages.[9] Michelle Nget stayed mostly at the West Side Saigon Grill, supervising staff, overseeing the efficient processing of telephoned delivery orders and checking on food quality and performance in the kitchen.[10]

The hiring and firing of staff was principally the responsibility of both Simon and Michelle Nget. Virtually all of the plaintiffs reported that when they went to apply for a job they met with either Simon or Michelle, who hired them on the spot.[11] The

Ngets also were responsible for setting compensation for employees and deciding other financial issues related to employee compensation, as well as imposing penalties on employees for perceived infractions of restaurant rules.[12] Moreover, we infer that they conferred with each other on such matters—including the firing of employees—when the issue was important. (*See, e.g.,* Tr. 66, 122; PX 21 ¶ 24; PX 45 ¶ 30).

A significant part of the business of Saigon Grill at all locations involved delivery of food orders telephoned to the restaurant. According to Simon Nget, deliveries accounted for an estimated twenty-five percent of revenues at the West Side location and about forty percent at the other location. (S. Nget Dep. 84–85). There is no question that the delivery side of the business was a key element of its success, as many people in mid and lower Manhattan rely on delivery from local restaurants, particularly for their evening meals. Moreover, the Saigon Grill eateries have received public plaudits for rapid and efficient home deliveries. (Tr. 384–85).[13]

---

Aff. ("PX 41") ¶ 23; Rui Guan Xie Aff. ("PX 31") ¶ 19; Shu Hua Chen Aff. ("PX 33") ¶ 22.

**7.** Tr. 14–15, 53, 78, 95–96, 100, 110, 114–15, 129–30, 140–41, 181, 221, 225; De Shun Chi Aff. ("PX 18") ¶ 19; PX 23 ¶ 18; PX 28 ¶ 22; PX 31 ¶¶ 17–19; PX 35 ¶ 20; Wen Zhong Chen Aff. ("PX 39") ¶ 28; PX 41 ¶¶ 23–24; Xin Wei Lin Aff. ("PX 42") ¶ 19; PX 43 ¶ 26; Zhao Yu Dong Aff. ("PX 48") ¶ 17; Ming Lin Aff. ("PX 27") ¶ 15; PX 33 ¶ 21.

**8.** *E.g.,* Tr. 36, 45; Bing Xing Li Aff. ("PX 16") ¶ 19; Guo Qi Chen Aff. ("PX 20") ¶ 21; PX 21 ¶ 22; PX 22 ¶ 26; Li Qiang Lin Aff. ("PX 24") ¶ 25; PX 25 ¶ 22; PX 34 ¶ 25; PX 37 ¶ 24; PX 42 ¶ 22; Yi Lan Lin Aff. ("PX 44") ¶ 23; PX 46 ¶ 26.

**9.** Tr. 56–57, 370; PX 15 ¶ 23; PX 20 ¶ 19.

**10.** M. Nget Dep. 20; Tr. 58; PX 14 ¶ 27; PX 15 ¶ 24; PX 20 ¶ 20; PX 22 ¶ 25; PX 25 ¶ 21; PX 26 ¶ 19; PX 28 ¶ 20; PX 29 ¶ 20; Qiang Hua Li Aff. ("PX 30") ¶ 19; PX 39 ¶ 27.

**11.** *E.g.,* Tr. 25, 199, 307, 319; PX 14 ¶ 26; PX 16 ¶ 18; PX 19 ¶ 23; PX 22 ¶ 23.

**12.** Tr. 47, 206, 231, 271, 283, 299; PX 14 ¶ 23; PX 15 ¶ 19; PX 19 ¶ 20; PX 20 ¶ 17; PX 21 ¶ 19; PX 22 ¶ 20; PX 24 ¶ 21; PX 25 ¶ 19; PX 28 ¶ 18; PX 31 ¶ 17; PX 33 ¶ 19; PX 34 ¶ 20; PX 37 ¶ 19; PX 39 ¶ 22; PX 41 ¶ 20; PX 42 ¶ 16; PX 43 ¶ 20; PX 44 ¶ 19; Yu Guan Ke Aff. ("PX 45") ¶ 23; PX 46 ¶ 21; PX 47 ¶ 21.

**13.** The other revenue sources were customers who ate at the restaurants and a smaller number who picked up food to take away.

To meet the need to deliver meals to customers' residences or other locations, defendants needed to have available a large coterie of deliverymen. It appears that the West Side 90th Street restaurant had as many as twenty-two delivery men on staff at any one time, and they all worked long hours. (Tr. 402–03). The restaurant opened for business at 11:30 a.m., and remained open until midnight. (JPTO 10 at ¶ 27; Tr. 353). As for the East Side Saigon Grill, it was open from 11:30 a.m. to 11:30 p.m. and the University Place location opens at 11:30 a.m. and closes at midnight. (JPTO 10 at ¶¶ 28–29; Tr. 353). Both of these establishments have utilized about six to ten deliverymen. (Tr. 403).

All thirty-six plaintiffs are Chinese nationals who came to the United States from Fujian province. None had more than a rudimentary education in China, and none is fluent in English. Typically, they have enough knowledge to recognize street signs. It appears that none of the thirty-five deliverymen has worked at any job other than delivering food for restaurants. All reported that they had gotten their job with Saigon Grill after being told by a friend or relative that the restaurant had an opening.[14]

The hiring process appears to have been quite consistent. Each testifying plaintiff described having been instructed to go to the restaurant, where he met typically with either Simon Nget, Michelle Nget, or Tony, who confirmed that there was a job available, instructed that the plaintiff should start the next day, and told the applicant what his work schedule would be.[15] According to virtually all of the plaintiffs, they were also told by either Simon or Michelle Nget or Tony that they needed a bicycle (and in several cases a plaintiff claimed that he was told to have a motorbike) to make deliveries.[16] Each plaintiff either already had a bicycle or procured one to do his job, and because of the wear and tear of bicycling to and from numberous deliveries on a daily basis, they all incurred expenses from repeatedly either repairing or replacing these bicycles.

When hiring plaintiffs, the defendants did not request work or immigration papers from them. (PX 23 ¶ 26; PX 24 ¶ 38). The defendants also did not maintain or preserve records of the amount of time that the plaintiffs actually spent on the job and the amounts paid as wages, and they did not supply any such documents to the plaintiffs. (E.g., PX 23 ¶ 27). In contrast, defendants did maintain a computerized system to keep track of all deliveries. The computerized database contained each delivery order, including addresses and time, and each deliveryman was required, before making a delivery, to punch into the computer his pre-assigned letter code next to the listing of the order. (Tr. 46–47, 393–95; see PX 1).

Although this computer system presumably created a detailed record of the frequency of deliveries and the presence of the deliverymen at the restaurant throughout the workday, according to defendants' counsel, his clients chose for undisclosed reasons not to preserve the computerized date. (Tr. 495–96). As a result, when

---

14. E.g., Tr. 22–26, 83–84, 114, 155; PX 14 ¶¶ 4–5; PX 15 ¶¶ 4–5; PX 16 ¶ 5; PX 18 ¶¶ 3–4; PX 19 ¶¶ 4–5; PX 20 ¶¶ 3–4; PX 21 ¶¶ 4–5.

15. E.g., Tr. 24–26, 85, 114, 140, 162–63, 167, 180–81, 192–93, 211, 218–19, 246, 265–66, 303–04, 307, 318–19, 321, 329; PX 14 ¶ 26; PX 15 ¶ 22; PX 16 ¶ 18; PX 22 ¶ 23.

16. E.g., Tr. 131, 140, 155, 170, 181–85, 193, 199, 219, 246–47, 255, 312–13, 319, 321; PX 14 ¶ 18; PX 19 ¶ 15; PX 29 ¶ 14; Wen Rui Zheng Aff. ("PX 38") ¶ 14; PX 43 ¶ 15; PX 46 ¶ 19; PX 47 ¶ 16.

plaintiffs' attorneys did an on-site inspection during the course of the litigation, they were able to obtain the computerized delivery records for only two days, in August 2006. (PX 1; *see* Tr. 495–96).

According to plaintiffs, most were required to work five or six days a week for about eleven, twelve or even thirteen hours a day. Many were required to work a sixth or seventh day for a shorter period, typically about five or six hours.[17] Some worked for six to seven hours daily six or seven days a week.[18] Plaintiffs also reported that although deliveries were less frequent between the end of the main lunch period and 6:00 p.m., they were all required to be available for deliveries throughout the day, and in fact typically each had to make a number of deliveries even during the slow hours.[19] Moreover, they all reported that when they were not making deliveries, they were required by defendants to perform so-called side work, which involved a number of tasks to prepare materials for use in the delivery of food to residences.[20] These tasks included, for example, cutting cardboard into pieces

to line the delivery bags and to separate dishes, filling small containers with various sauces, putting paper bags inside plastic bags, packing plastic utensils with napkins and soy packets, and restocking drinks.[21]

Defendants dispute this account of the hours worked by plaintiffs, claiming that only one deliveryman was to be on duty during the hours between 2:30 and 5:30 p.m. and after 9:30 p.m., and Simon Nget claimed that this person was selected by the deliverymen themselves. (Tr. 352–53, 360–61). In short, they contend that plaintiffs worked far fewer hours than they are claiming in this lawsuit, and specifically that the men were required to work only two shifts, from 11:30 a.m. to 2:30 p.m. and from 5:30 p.m. to 9:30 p.m.

This testimony is manifestly false. First, the plaintiffs have proffered a printed schedule of hours for the West Side location, and it reflects that the deliverymen, each identified by his letter code, were assigned to the shifts and hours that they described in their testimony. (PX 2).[22] Second, as noted, plaintiffs recovered

---

17. *E.g.,* Tr. 28–32; PX 50 ¶ 4; PX 14 ¶ 8; PX 15 ¶ 7; PX 16 ¶ 7; PX 18 ¶ 8; PX 20 ¶¶ 6–8; PX 21 ¶ 7; PX 22 ¶¶ 8–9; PX 24 ¶¶ 8–10; PX 25 ¶ 7–8; PX 28 ¶¶ 6–8; PX 29 ¶ 8; PX 31 ¶ 7; PX 32 ¶ 7; PX 33 ¶¶ 7–9; PX 34 ¶¶ 8–9; PX 35 ¶¶ 7–8; PX 37 ¶¶ 7–9.

18. *E.g.,* PX 14 ¶ 7; PX 19 ¶¶ 7–9; PX 20 ¶ 7; PX 22 ¶ 7; PX 23 ¶¶ 6–7; PX 24 ¶ 7; PX 25 ¶ 7; PX 26 ¶ 7; PX 27 ¶ 6; PX 28 ¶¶ 7–8; PX 30 ¶ 7.

19. Tr: 41, 90,; PX 14 ¶ 16; PX 18 ¶ 13; PX 21 ¶ 13; PX 25 ¶ 13; PX 38 ¶ 13; PX 39 ¶ 15; Xiang Wei Chen Aff. ("PX 40") ¶ 11; PX 44 ¶ 13; PX 45 ¶ 17; *see* PX 1

20. Simon and Michelle Nget denied that they had required the deliverymen to do this work, and claimed that some of them did it on their own to help out the one or two workers who were required to pack food in bags for delivery. Tr. 346–48, 422. Given the degree of organization of the operation needed to en-

sure efficient deliveries of food and the success of these defendants in earning a reputation for speed of delivery as well as their close supervision of all aspects of the restaurant business, this testimony—which flies in the face of the uniform testimony of all of the plaintiffs—is not credible.

21. *E.g.,* Tr. 38–42; PX 14 ¶ 16; PX 15 ¶ 13; PX 16 ¶ 12; PX 18 ¶ 12; PX 19 ¶ 13; PX 20 ¶ 11; PX 21 ¶¶ 11–12; PX 22 ¶ 14; PX 23 ¶ 10; PX 24 ¶ 16; PX 25 ¶ 12; PX 26 ¶ 11; PX 27 ¶ 10; PX 28 ¶ 12; PX 29 ¶ 12; PX 30 ¶ 11; PX 31 ¶ 11; PX 33 ¶ 13; PX 34 ¶ 14; PX 35 ¶ 12; PX 37 ¶ 13; PX 38 ¶ 11; PX 39 ¶ 15; PX 40 ¶ 10; PX 41 ¶¶ 13–14; PX 42 ¶ 10; PX 43 ¶ 13; PX 44 ¶ 12; PX 45 ¶¶ 15–16; PX 46 ¶ 14; PX 47 ¶ 14; PX 48 ¶ 11.

22. Although Simon Nget claimed that he did not recognize this list (Tr. 361), this disclaimer is not credible since it is clear that the schedule was hung on a wall at the West Side

computerized delivery records for two days in 2006 and they show that each of at least six deliverymen made multiple deliveries throughout the afternoon between 2:30 p.m. and 5:30 p.m., and that a similar number of men were making repeated deliveries long after 9:30 p.m. (PX 1). Finally, we note defendants' admission that they destroyed the computerized data about deliveries for all of the relevant period except for those two days. Under these circumstances, we may, and do, infer that the destroyed records would have shown a similar pattern, and indeed that they were likely to have shown still more such activity than the few preserved records, which date from the heart of August, a time when many New Yorkers are away on vacation.[23] *See, e.g., Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004) (spoliation of relevant evidence may support an inference that such evidence was unfavorable to the party that destroyed it).

Defendants Simon and Michelle Nget also assert that they had nothing to do with setting the work hours of the deliverymen, and that it was the workers themselves who arranged this (Tr. 361, 422), a claim that is at odds with the testimony of all of the plaintiffs. This testimony by defendants is manifestly incredible. The success of the business depended vitally on the efficient delivery of food orders in a geographically very large area, extending on the West Side up to at least 120th Street and down to 59th Street, and even as far east as the East Side after the closing of the Second Avenue location. (Tr. 359; *see* PX 1).[24] It is inconceivable that the Ngets, who were very hands-on in their management of restaurant operations, would have left to their hired hands—none of whom had any business or organizational experience and were hired with essentially no vetting just to do deliveries—the responsibility for organizing and maintaining an essential and somewhat complex aspect of this very profitable business.

Because of the long hours that the plaintiffs were required to work, the restaurant supplied them some food to eat for lunch and dinner, although many testified that there frequently was insufficient food for all of them and that they then had to buy their own or even go without.[25] The deliverymen credibly testified that they did not have any specific times set aside for meals, and that they were expected to find time between deliveries and during side work in which to ·eat.[26] There is no indication in

location and that Simon Nget spent most of his time there. Moreover, in view of his control over all operations, he would certainly have been familiar with the details of that schedule and with the fact that it was posted for easy reference by the staff.

23. In addition, Simon Nget confirmed that the West Side restaurant does a significant part of its deliveries to Columbia University students (Tr. 363–64), and we note that most students are away during the summer.

24. Simon Nget claimed that he had paid one or two extra dollars to his deliverymen for each delivery above 100th Street or below 80th Street on the West Side. (Tr. 359–60). There is no testimony corroborating this assertion, nor any documentation.

25. *E.g.,* Tr. 44, 92–93, 136, 179; PX 42 ¶ 11; PX 31 ¶ 12; PX 14 ¶ 17; PX 15 ¶ 14; PX 15 ¶ 13; PX 18 ¶ 14; PX 19 ¶ 14; PX 20 ¶ 12; PX 21 ¶ 14; PX 22 ¶ 15; PX 23 ¶ 11; PX 24 ¶ 17; PX 25 ¶ 14; PX 26 ¶ 12; PX 27 ¶ 11; PX 28 ¶ 13; PX 29 ¶ 13; PX 30 ¶ 12; PX 33 ¶ 14; PX 34 ¶ 15; PX 35 ¶ 13; PX 37 ¶ 14; PX 38 ¶ 13; PX 39 ¶ 16; PX 40 ¶ 12; PX 41 ¶ 15; PX 43 ¶ 14; PX 44 ¶ 14; PX 45 ¶ 18; PX 46 ¶ 15; PX 47 ¶ 15; PX 48 ¶ 12.

26. Tr. 44, 93; PX 14 ¶ 17; PX 15 ¶ 14; PX 16 ¶ 13; PX 18 ¶ 14; PX 19 ¶ 14; PX 20 ¶ 12; PX 21 ¶ 14; PX 22 ¶ 15; PX 23 ¶ 11; PX 24 ¶ 17; PX 25 ¶ 14; PX 26 ¶ 12; PX 27 ¶ 11; PX 28 ¶ 13; PX 30 ¶ 13; PX 30 ¶ 12; PX 31 ¶ 12; PX 33 ¶ 14; PX 34 ¶ 15; PX 35 ¶ 13; PX 37 ¶ 14; PX 38 ¶ 13; PX 39 ¶ 16; PX 40 ¶ 12; PX 42 ¶ 11; PX 43 ¶ 14; PX 44 ¶ 14; PX 45 ¶ 18; PX

the record that the restaurant kept any records reflecting the out-of-pocket cost of supplying these meals to the deliverymen.

The plaintiffs report that they were required to make numerous deliveries on a daily basis. These could total as many as thirty-five or forty on busy days, and they reported receiving fairly substantial tip income, which they estimated, in some instances, totaled as much as $3,500.00 to $4,000.00 monthly.[27] As for their wages, those working the longer shifts were paid a monthly wage of approximately $520.00 to $600.00, and those working shorter shifts were paid approximately $340.00 monthly.[28] All wages were paid in cash, and were typically handed out in envelopes by Michelle Nget at the West Side location and by her or Tony at the other establishment.[29]

The record also reflects a somewhat obscure procedure undertaken by defendants, with the apparent goal of creating a false paper record of payments to the deliverymen. Each month, defendants gave a number of the plaintiffs a check in amounts ranging from about $800.00 to approximately $1,000.00, and required that the employee deposit the check in a bank account, withdraw the same amount in cash and return the cash to Simon or Michelle Nget.[30] Although defendants claimed that this procedure was undertaken at the request of the plaintiffs for unstated tax reasons (Tr. 370–72), that is self-evidently false. These plaintiffs are extremely unsophisticated and highly unlikely to have designed this unorthodox procedure. Moreover, it is entirely unclear how creating this sort of paper trail (which reflects higher wages than plaintiffs actually received from the restaurant) would assist them in dealing with the IRS or other taxing authorities. Rather, it appears to have been part of an effort by the defendants to create a record suggesting that they were paying their employees more than was in fact the case, whether to pump up their deductions for business expenses, to suggest that they were paying required minimum wages, or for some other unstated purpose.

The plaintiffs uniformly testified that defendants did not post any notices in their restaurants advising the work staff of their minimum-wage and overtime rights or stating that defendants were taking tip income into account in determining the minimum wage to which the plaintiffs would be entitled.[31] This testimony was

---

46 ¶ 15; PX 37 ¶ 15; PX 48 ¶ 12. A number of plaintiffs reported that, between deliveries and the required side work, they often did not have time to eat during their workday, Tr. 93, 107, 137, and others said that they were fired for delaying a delivery. Tr. 136; PX 42 ¶ 23.

**27.** Tr. 229; PX 15 ¶ 7; PX 16 ¶ 7; PX 21 ¶ 7; PX 22 ¶ 9; PX 24 ¶ 10; PX 25 ¶ 8; PX 41 ¶ 9; PX 44 ¶ 7.

**28.** Tr. 28, 32, 86; PX 14 ¶¶ 7–11; PX 16 ¶ 7; PX 18 ¶¶ 6, 8; PX 19 ¶¶ 7–8; PX 20 ¶¶ 6–8; PX 21 ¶ 7; PX 22 ¶¶ 7–9; PX 23 ¶ 6; PX 24 ¶¶ 7–10; PX 25 ¶¶ 7–8; PX 26 ¶ 7; PX 27 ¶ 6; PX 28 ¶¶ 6–8; PX 29 ¶ 8; PX 31 ¶ 7; PX 33 ¶¶ 6–9; PX 34 ¶¶ 7–9; PX 35 ¶¶ 7–8; PX 36 ¶¶ 7–9; PX 38 ¶¶ 6–7; PX 39 ¶ 8; PX 41 ¶¶ 6–9; PX 42 ¶¶ 7–8; PX 43 ¶¶ 8–10; PX 44 ¶¶ 6–

7; PX 45 ¶¶ 7–11; PX 46 ¶ 8; PX 47 ¶¶ 7–10; PX 48 ¶ 7.

**29.** Tr. 58, 80, 253, 369, 438; PX 14 ¶ 13; PX 15 ¶ 10; PX 18 ¶ 19; PX 19 ¶ 11; PX 21 ¶ 8; PX 22 ¶ 11; PX 25 ¶ 10; PX 27 ¶ 17; PX 29 ¶ 10; PX 30 ¶ 9; PX 38 ¶ 9; PX 39 ¶ 12; PX 41 ¶ 11; PX 46 ¶ 11; PX 47 ¶ 12.

**30.** *E.g.,* Tr. 88–89, 150–52, 168, 297, 253–54, 263, 314; PX 14 ¶ 14; PX 15 ¶ 11; PX 24 ¶ 14; PX 34 ¶ 12; PX 46 ¶ 12.

**31.** Tr. 26, 85, 164; PX 14 ¶ 33–36; PX 15 ¶¶ 31–34; PX 16 ¶¶ 25–28; PX 18 ¶¶ 22–25; PX 19 ¶¶ 28–31; PX 20 ¶¶ 22–25; PX 21 ¶¶ 27–30; PX 22 ¶¶ 33–36; PX 23 ¶¶ 20–23; PX 24 ¶¶ 32–35; PX 25 ¶¶ 28–29; PX 26 ¶¶ 25–28; PX 27 ¶¶ 19–22; PX 28 ¶¶ 28–31;

also corroborated by defendant Sung Truong. (Truong Dep. 96). There is also no evidence that either Simon or Michelle Nget (or anyone else on their behalf) ever communicated by any other means to the restaurant employees what their rights were under the labor laws or that defendants were calculating wages based on tip income. Indeed, Simon Nget testified at his deposition that although he was aware of the legal requirements concerning minimum wages and overtime, he had not bothered to comply with those requirements. (Nget Dep. 63–66, 158–59, 175–76, 184–85). In short, plaintiffs' testimony about the lack of notice by defendants is uncontradicted in the record even though defendants' attorney now argues—with no evidentiary basis—that the plaintiffs were so notified. (Defs.' Post-trial Memo at 5–6).

As for other pertinent practices at the restaurant, the plaintiffs uniformly testified that the Ngets routinely imposed what they referred to as "fines" on the deliverymen for a variety of perceived infractions of their rules. Most commonly they were fined for not logging a delivery into the computer system, although these fines were also imposed for a variety of other lapses, including letting a door slam too loudly, failing to make a delivery as rapidly as defendants thought appropriate or forgetting to have a delivery customer sign a credit-card receipt. The size of the fines varied—they typically were at least $20.00, although on occasion defendants imposed substantially larger fines, up to $200.00.[32]

According to defendants, it was the employees themselves who arranged this system of fines. (Tr. 77, 144; Def. Post-trial Mem. at 10). Defendants also claim that some of the money received from the fines was used to pay for food that the restaurant supplied to the deliverymen. (Tr. 77, 143, 324). The evidence does not support either of these contentions.

There would have been no incentive for the employees to set up such a system to fine themselves, and the testimony of the plaintiffs to the contrary is entirely credible. Moreover, to the extent that defendants claim to have used the fine money to pay for food for the employees, even if credited, that testimony makes clear that the money went in the first instance to defendants. As for the alleged use of the money to benefit the employees, that suggestion appears entirely baseless. There is no dispute that the restaurant was supplying lunch and dinner to the deliverymen as a routine matter and without reference to payments of fines. That is not surprising since defendants needed the deliverymen to be available on site at all times, and needed them well enough fed that they could undertake their strenuous work of delivering food rapidly over a large geographic area. Hence, the only function of the fines was to add to the defendants' coffers, not to provide food that was already being made available. Finally, we note that defendants kept no records of expenditures for food supplied to employees, whether on a regular basis or by use of these fines.

PX 29 ¶¶ 24–27; PX 30 ¶¶ 24–27; PX 31 ¶¶ 21–24; PX 34 ¶¶ 32–35; PX 35 ¶¶ 21–24; PX 36 ¶¶ 25–28; PX 38 ¶¶ 23–26; PX 39 ¶¶ 34–37; PX 40 ¶¶ 18–21; PX 41 ¶¶ 35–37; PX 42 ¶¶ 24–27; PX 43 ¶¶ 27–30; PX 44 ¶¶ 29–31; PX 45 ¶¶ 33–36; PX 46 ¶¶ 32–33; PX 47 ¶¶ 34–37; PX 48 ¶¶ 18–21.

32. *E.q.*, Tr. 47–48, 100, 142, 156, 170, 174, 181, 185, 193–94, 199, 230–31, 255, 265, 270–71, 283, 287, 291, 299, 309, 323; PX 42 ¶¶ 16–18; PX 22 ¶¶ 20–21; PX 44 ¶ 19; PX 47 ¶¶ 21–22; PX 31 ¶ 17; PX 37 ¶¶ 19–21; PX 20 ¶ 17; PX 33 ¶ 19; PX 41 ¶¶ 20–22; PX 15 ¶¶ 19–21; PX 24 ¶ 21; PX 34 ¶ 20; PX 25 ¶ 19; PX 19 ¶¶ 20–22; PX 14 ¶¶ 23–25; PX 28 ¶¶ 18–19; PX 23 ¶ 15; PX 39 ¶ 23; PX 43 ¶¶ 20–21; PX 46 ¶ 21; PX 21 ¶ 19; PX 31 ¶ 17; PX 45 ¶ 23.

The Ngets imposed quotas on the deliverymen for side work involving the number of sauce containers to be filled.[33] Because of the need to make prompt deliveries, many of the employees were unable to meet the quotas imposed on them by management for their side work. In such circumstances, some of the deliverymen arrived before the start of their shift or remained after it ended in order to complete their required side work.[34] As for others who could not meet their quotas, Michelle Nget told them to pay her a sum of money—between ten and thirty dollars—to compensate Hispanic kitchen workers to complete their side work.[35] These payments to Michelle Nget to cover some of the plaintiffs' shortfalls in side work also represent money given back by plaintiffs to defendants for defendants' own benefit. The record is silent as to whether the Ngets ever paid any of these funds to the kitchen workers but even if they did—which we do not find—the payments by the deliverymen would represent a diminution of the wages that defendants paid to the plaintiffs, and the diminution was done to benefit defendants, who either kept the money or gave it to others to perform work that benefitted the business.

Some of the plaintiffs were fired for arguable misconduct. They reported that the decision to fire them was almost uniformly communicated by Michelle or Simon Nget, although one plaintiff, who worked at the Second Avenue location, testified that he was told of his firing by Tony.[36]

In February or March 2007, some of the plaintiffs learned that deliverymen at another Manhattan restaurant had filed a complaint about not being paid the minimum wage or overtime, and that the complaint had resulted in a substantial settlement or award. This became a subject of discussion among the Saigon Grill deliverymen, and some signed authorizations for the filing of a lawsuit. (Tr. 118; PX 45 ¶ 27–30). On March 2, 2007 Simon and Michelle Nget called a meeting of all deliverymen at the West Side location because they had learned of the threat of a lawsuit. At the meeting Simon Nget told the deliverymen that he was aware of the discussions among them about their pay and the other proceeding. He informed them that if they signed a piece of paper that he held up but did not show them and which was apparently in English rather than Chinese, he would increase their pay; on the other hand, he told them, if they refused to sign, he would immediately discontinue delivery service from the restaurant and fire them all. The men all refused to sign, and he accordingly told them that they were not to report for work anymore.[37] According

---

33. *E.g.,* PX 15 ¶ 13; PX 16 ¶ 12; PX 18 ¶ 12; PX 19 ¶ 13; PX 20 ¶ 11; PX 21 ¶¶ 11–12; PX 22 ¶ 14; PX 24 ¶ 16; PX 25 ¶ 12; PX 26 ¶¶ 11–12; PX 27 ¶ 10; PX 28 ¶ 12; PX 29 ¶ 12; PX 30 ¶¶ 11–12; PX 31 ¶ 11; PX 33 ¶ 13; 34 ¶ 14; PX 35 ¶ 12; PX 37 ¶ 13; PX 38 ¶ 11; PX 39 ¶ 15; PX 40 ¶ 10; PX 41 ¶ 10; PX 42 ¶ 10; PX 43 ¶ 13; PX 44 ¶ 12; PX 45 ¶ 15; PX 46 ¶ 14; PX 47 ¶ 14; PX 48 ¶ 11.

34. *E.g.,* PX 37 ¶ 13; PX 45 ¶ 16; PX 46 ¶ 14.

35. *E.g.,* PX 14 ¶ 16; PX 16 ¶ 12; PX 30 ¶ 11; PX 41 ¶ 14; PX 45 ¶ 16.

36. Tr. 189; PX 23 ¶ 19; PX 31 ¶ 19; PX 33 ¶ 22. Plaintiff's infraction was not delivering the food to the customer's apartment and instead asking the customer to receive it at the front door of the building, a step that the plaintiff reported taking after being warned by another deliveryman that the building was dangerous and that he had in fact been attacked when making a delivery there. (Tr. 326; PX 14 ¶ 18).

37. *E.g.,* Tr. 66–67, 157–59, 232–33, 247–48, 260; PX 45 ¶¶ 27–30; PX 22 ¶¶ 27–29; PX 30 ¶¶ 20–22; PX 15 ¶¶ 26–28; PX 14 ¶¶ 28–30; PX 16 ¶¶ 20–22; PX 19 ¶¶ 24–26; PX 21

to those plaintiffs present at this meeting, Michelle Nget also spoke in threatening terms to them, in an apparent effort to intimidate them into signing what we infer was a waiver of any claims against the defendants. (PX 21 ¶ 24; PX 45 ¶ 30). Since those threats did not have their desired effect, as of the next day the Saigon Grill restaurants announced the immediate end of delivery services and all of their deliverymen were laid off.[38]

Based on these terminations, the Restaurant Workers Union later filed a charge of unfair labor practices with the National Labor Relations Board, and on February 18, 2008 an NLRB administrative law judge found that defendants Saigon Gourmet Restaurant Inc. and Saigon Spice Inc. had committed an unfair labor practice by terminating the deliverymen because their owners believed that the employees were intending to file suit under the Fair Labor Standards Act. *Saigon Gourmet Rest., Inc.,* No. 2–CA–38252, 2008 WL 449658 at *4 (N.L.R.B. Feb. 14, 2008). The ALJ recommended that the corporations be required to offer the fired employees reinstatement. *Id.* at **5–6. Defendants have in fact done so, and a number of the plaintiffs accepted the offer. (Tr. 431; PX 22 ¶ 32; PX 24 ¶ 31).

*ANALYSIS*

We first consider issues of liability and then address the appropriate remedies.

I. *FLSA*

Under the terms of the FLSA, employers, as defined, are required to pay their employees specified minimum wages and overtime. 29 U.S.C. §§ 206, 207. There is no dispute that the defendant corporations and Simon Nget were subject to these laws during the time of plaintiffs' employment and that the plaintiffs were covered employees. (JPTO 11).

 If the employees ordinarily receive customer tips in the course of their employment, the employer may take a tip credit. 29 U.S.C. § 203(m). To be eligible for the tip credit, however, the employer must first notify the employees of the requirements of the law regarding minimum wages and of the employer's intention to take the tip credit, that is, to include tip income when calculating wages actually paid for minimum-wage purposes. *See, e.g., Kilgore v. Outback Steakhouse,* 160 F.3d 294, 298 (6th Cir.1998); *Chan v. Sung Yue Tung Corp.,* 2007 WL 313483, *14 (S.D.N.Y. Feb.1, 2007); *Chung v. New Silver Palace Rest.,* 246 F.Supp.2d 220, 228–29 (S.D.N.Y.2002). In this case the testimony is undisputed that defendants never provided such notice to any of the plaintiffs. Hence, plaintiffs' tip income cannot be applied to satisfy defendants' obligation to pay the minimum wage.

 In determining whether the plaintiffs received the minimum wage and overtime, we start with the premise that the employer is obligated to maintain records of wages and hours. *See, e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). In the absence of documentation, the employee may rely on his own recollection to meet his initial burden, *see, e.g., Rivera v. Ndola Pharm. Corp.,* 497 F.Supp.2d 381, 388 (E.D.N.Y.2007); *Yang*

¶¶ 23–25; PX 24 ¶¶ 26–28; PX 25 ¶¶ 23–25; PX 26 ¶¶ 20–22; PX 28 ¶¶ 23–25; PX 34 ¶¶ 26–28; PX 39 ¶¶ 29–31; PX 41 ¶¶ 27–29; PX 44 ¶ 24–26; PX 46 ¶¶ 27–29; PX 47 ¶¶ 28–30.

**38.** Tr. 159; PX 14 ¶ 30; PX 15 ¶ 28; PX 16 ¶ 22; PX 18 ¶ 20; PX 19 ¶ 26; PX 21 ¶ 25; PX 22 ¶ 29; PX 24 ¶ 28; PX 25 ¶ 24; PX 26 ¶ 22; PX 28 ¶ 25; PX 30 ¶ 22; PX 34 ¶ 28; PX 39 ¶ 31; PX 41 ¶ 29; PX 44 ¶ 26; PX 45 ¶ 30; PX 46 ¶ 29; PX 47 ¶ 30.

*v. ACBL Corp.*, 427 F.Supp.2d 327, 335–36 (S.D.N.Y.2005), in which case the employer must proffer evidence sufficient to rebut that recollection. *See Anderson*, 328 U.S. at 688, 66 S.Ct. 1187. Plaintiff's proof need not be precise, and if the court finds the testimony credible, it may make an award based on an approximation of the employee's losses. *E.g., Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 67 (2d Cir.1997).

In this case defendants failed to keep records of hours or pay. Indeed, as noted, they deliberately destroyed data reflecting deliveries, which could also have provided some concrete guidance as to the hours worked by the deliverymen. Under these circumstances the testimony of the plaintiffs as to their hours and pay, which was reasonably precise and quite consistent, was sufficient to meet their initial burden. We note as well that their version of their working day was confirmed by a detailed printed schedule for deliverymen at the West Side location (PX 2), a schedule that, as noted, was prepared by defendants.

Insofar as defendants sought to rebut the plaintiffs' testimony, principally by contending that they worked only two shifts, from 11:30 a.m. to 2:30 p.m. and then from 5:30 p.m. to 9:30 p.m., we reject that assertion as incredible and rebutted not only by plaintiffs' consistent testimony and by the written work schedule of the West Side restaurant, but also by the small segment of data that survived defendants' apparent spoliation of the computer records of deliveries. Defendants Simon and Michelle Nget testified that during the mid-afternoon—between 2:30 p.m. and 5:30 p.m.—and after 9:30 p.m., only one deliveryman remained on duty.[39] The printed work schedule, however, reflects that most of the deliverymen were on duty from 11:30 a.m. to late in the evening, many until 11:30 p.m. or midnight. Although some worked a shorter shift on some days, that shift lasted for five or six hours, as plaintiffs testified. Moreover, the surviving computer records for a two-day period showed that numerous deliverymen on those days made multiple deliveries during the periods from 2:30 p.m. to 5:30 p.m. and after 9:30 p.m. (*See* PX 1).

In addition, as noted, we credit the plaintiffs' testimony that during the slower times and between deliveries they were required to perform various forms of side work that was necessary to ensure that once the food was prepared in the kitchen, it was promptly packed and delivered. Between deliveries and such side work, as well as the need for the deliverymen to eat lunch and dinner, there is ample basis to find that plaintiffs worked one long shift each day.

In short, we find that the plaintiffs' testimony as to the number of hours that they worked was entirely credible, and we further find that defendants have failed to rebut it. As for wages, defendants do not meaningfully dispute the plaintiffs' account of what they were paid in wages on a monthly basis.

█ Similarly, even though there were occasional periods when the deliverymen were not making deliveries or doing side work or eating, that does not change the result. In these interstitial periods plaintiffs were waiting to make deliveries or perform other services for the restaurants. As a legal matter, an employer must pay his employees for waiting time between

---

**39.** The defendants further insisted that this deliveryman was chosen by his colleagues. (Tr. 347, 360). The latter assertion, although not central to the issues, is plainly false since, for reasons noted, we find that the Ngets maintained tight control over all restaurant operations, including deliveries.

tasks if the employees are expected to be ready whenever performance is required, 29 U.S.C. § 203(g), *see, e.g., Moon v. Kwon,* 248 F.Supp.2d 201, 229 (S.D.N.Y. 2002), since, as the Supreme Court has noted, "[r]eadiness to serve may be hired, quite as much as service itself. . . ." *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944). To avoid liability the employer must "definitely [tell the employee] in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." 29 C.F.R. § 785.16(a). In this case, as we have noted, the plaintiffs were expected to be available to make deliveries as needed throughout their tours of duty, and were also required by defendants to perform other tasks between deliveries. Under these circumstances, defendants have offered no basis for determining that plaintiffs were not working uninterrupted extended shifts from the time that they first reported to work until they left for home. *See, e.g., Reich,* 121 F.3d at 65–66; *see also Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 288 (2d Cir.2008).

Apart from the measurement of hours worked and pay received, the parties dispute three other issues pertinent to measuring whether defendants complied with minimum-wage and overtime requirements, and, if not, the amounts by which the plaintiffs were underpaid. These concern (1) the imposition by defendants of fines on the deliverymen from time to time for perceived misbehavior, (2) payments extracted by defendants from the employees in lieu of their having met their quota of side work, and (3) the expenses that the deliverymen incurred in buying or repairing bicycles or other means of transportation—expenses that they claim are compensable as being tools of their trade. We address each of these items separately.

For purposes of determining wages actually paid, we look to the amounts actually paid "finally and unconditionally, or 'free and clear'." 29 C.F.R. § 531.35. Wages that the employee is required to return "directly or indirectly to the employer or another person for the employer's benefit" must be subtracted for purposes of calculation of wages. *Id.*

In this case plaintiffs testified that defendants exacted two forms of payment from them. First, they reported that Michelle Nget and, on occasion, Sung Truong would require them from time to time to pay amounts of money to the restaurant—ranging from $20.00 to occasionally as much as $200.00—as "fines" for a variety of misdeeds. In addition, a number of plaintiffs testified that when they were unable to meet their restaurant-imposed quotas for side work, they were told to pay Michelle Nget to arrange for one of the Hispanic kitchen workers to do their side work and satisfy their quotas.

The fact that fines were paid was, in substance, conceded by defendants, although they suggested that this system was imposed by the deliverymen and that the money was then used to pay for food given to the employees. For reasons noted, that assertion is not credible since the restaurant was already supplying meals to the employees. Moreover, even if the money was used to enhance their meals in some unspecified respect, defendants could not take a credit for that or for the meals ordinarily supplied to plaintiffs.

By law, an employer may claim a meal credit if it is properly documented. *See* 29 U.S.C. § 203(m) (credit for non-cash benefits supplied to wage earners). The amount of the credit is limited to the "actual cost to the employer." 29 C.F.R. § 531.3(a). *See also* 29 C.F.R. § 531.3(b). Moreover, the employer must retain records documenting the out-of-pocket costs

that it incurred, 29 C.F.R. § 516.27(a), and bears the burden of proving both the actual costs and their reasonableness. *See, e.g., Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 475 (11th Cir.1982); *Morgan v. SpeakEasy, LLC,* 2007 WL 2757170, *20 (N.D.Ill. Sept. 20, 2007); *Dole v. Bishop,* 740 F.Supp. 1221, 1227 (S.D.Miss.1990).

Defendants fail to carry that burden. They have proffered no records reflecting the cost of feeding the plaintiffs, and have not even offered any alternative evidence of such an out-of-pocket cost. Hence they cannot claim a credit for meals. It follows as well that, to the extent that they imposed fines, even if they used those fines to subsidize the cost of providing meals to employees, they cannot taken a credit for that. Necessarily, then, the fines must be deducted from wages paid to the plaintiffs for purposes of minimum-wage and overtime calculations.

■ As for money that some of the plaintiffs paid to Michelle Nget purportedly to compensate kitchen workers for completing the plaintiffs' side work, those payments too must be deducted from the employees' wages for purposes of determining defendants' compliance with minimum-wage and overtime requirements. Under the FLSA any money that the employee " 'kicks back' directly or indirectly to the employer or another person for the employer's benefit" must be excluded from calculation of the employee's actual wages. 29 C.F.R. § 531.35. The cash payments to Michelle Nget were demanded of plaintiffs for the benefit of the defendants, that is, to ensure that a sufficient amount of side work was accomplished by the restaurant staff. Accordingly, these payments must be deducted from the amount of the plaintiffs' wages.

■ As for the "tools of the trade" issue, defendants deny having told the plaintiffs that they needed a bicycle (or a motorbike), but that testimony is simply not credible, and we have found that they did communicate a requirement that the deliverymen use a bicycle. Defendants alternatively argue that, even if so, the bicycles were not tools of the trade.

The governing test is stated in the pertinent Department of Labor regulation:

> If it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by an employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35. There is no question, in light of the record, that vehicular transportation—whether by bicycle or motorbike—was a necessary component of the job of the deliverymen, as defendants Simon and Michelle Nget both made clear to the plaintiffs. The primary role of these men was to deliver hot meals to hungry and often impatient customers over a large geographic expanse, extending on the West Side approximately from 59th to 120th Streets (a distance of one-and-a-half miles in either direction from the West Side location) and as far east as the East Side (a distance of up to a mile from the West Side restaurant). Moreover, the importance of prompt delivery is clear beyond dispute; it is an essential part of the restaurant's publicly touted reputation, and when customers called to complain about delays, the Ngets thought it sufficiently important to fine the deliverymen and in several instances to fire them. Absent bicycles or motorbikes, it would have been impossible for the deliverymen to carry out their job in a manner that satisfied the

business needs of the restaurant and the defendants' demands about performance.[40]

In short, the bicycles and motorbikes plainly fit the applicable regulation. Moreover, although defendants seek to distinguish them from tools or other pieces of equipment necessary to perform a job, there is no basis for such a distinction. Indeed, there is substantial legal authority for the proposition that mechanisms for transportation—typically motor vehicles— can be tools of the trade. *See, e.g., Herman v. Express Sixty–Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir. 1998); *Brennan v. Modern Chevrolet Co.,* 363 F.Supp. 327, 333 (N.D.Tex.1973), *aff'd,* 491 F.2d 1271 (5th Cir.1974). Finally, the plaintiffs testified that they used the bicycles primarily for their work,[41] an assertion that is entirely credible in view of the importance of the bicycle for that purpose and the very heavy use to which it was put on the job, resulting in the need for frequent repairs and replacements. *See, e.g., Brennan,* 363 F.Supp. at 333. *Cf. Arriaga v. Florida Pac. Farms,* 305 F.3d 1228, 1233, 1236–37 (11th Cir.2002); *Rivera,* 2008 WL 81570 at *7–8. Since the employee is entitled to a credit for expenses for "facilities" that are "primarily for the benefit or convenience of the employer", 29 C.F.R. § 531.3(d)(1), plaintiffs' bicycles and motorbikes and the expense of their acquisition and repair while plaintiffs were employed are covered.

In short, in measuring wages we take into account the costs that plaintiffs in-curred in purchasing bicycles after they were hired and in repairing them during their employment by defendants.

## II. *FLSA Statute of Limitation*

 We next consider the time period for which plaintiffs seek compensation. The statute of limitations under the FLSA is ordinarily two years, but it may be extended to three years if the claim arises from a "willful" violation. 29 U.S.C. § 255(a). The willfulness requirement may be satisfied if the employer either acted knowingly or "showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). The conduct at issue here plainly reflects willfulness.

Based on Simon Nget's past employment as a waiter and his status as an informed and astute businessman, there is no question that he was aware of the legal requirements for paying a minimum wage and overtime and that he chose to ignore those requirements. Indeed, he substantially admitted that he had simply chosen not to comply with legal requirements. (S. Nget Dep. 158–59, 164). Moreover, the contrivances adopted by the defendants— most notably the check-cashing scheme that they concocted to create a false records of payments to the staff—bespeak an intention to mislead governmental authorities about payments actually made to the plaintiffs. As for Michelle Nget, although

---

**40.** The only other means of moving swiftly would have been the use of taxis, buses or subways, an expense that neither the restaurants nor the deliverymen were about to bear. Moreover, even such a means of transportation was likely to be unsatisfactory since buses and subways would have left the men to walk additional distances to get from the subway station or bus stop to the delivery address, and all three modes of publicly avail-able transport carried the risk of unpredictable waiting times.

**41.** Tr. 63, 98, 131, 155, 170, 185, 199, 219, 247, 255, 321, 369; PX 14 ¶ 21; PX 15 ¶ 17; PX 16 ¶ 16; PX 19 ¶ 18; PX 20 ¶ 15; PX 21 ¶ 17; PX 23 ¶ 13; PX 25 ¶ 17; PX 26 ¶ 15; PX 29 ¶ 17; PX 33 ¶ 17; PX 34 ¶ 18; PX 37 ¶ 16; PX 38 ¶ 14; PX 39 ¶ 17; PX 42 ¶ 14; PX 43 ¶¶ 15, 17; PX 46 ¶ 16; PX 47 ¶ 19.

she professed ignorance of the legal requirements (M. Nget Dep. 140–41), her intimate involvement in the financial side of the business, as well as the establishment of a corporate network to control the restaurants, makes that claim unbelievable, and at the very least her professed ignorance reflects "reckless disregard" for those legal requirements. *See, e.g., Herman v. RSR Secs. Servs., Ltd.,* 172 F.3d 132, 141–42 (2d Cir.1999); *Breen v. Concrete by Wagner, Inc.,* 1999 WL 1016267, *13 (N.D.Ill. Nov.4, 1999). In short, at a minimum plaintiffs may recover minimum wages and overtime going back three years under federal law.[42]

■ More ambitiously, plaintiffs argue against imposition of any statute of limitations, asserting that equitable tolling should apply up to the point that they learned of the requirements of the minimum-wage and overtime laws, shortly before they filed this lawsuit. We agree.

■ As a general matter, equitable tolling may be used to suspend the statute of limitations "against a plaintiff who is unaware of his cause of action", a step that is particularly appropriate if the defendant's conduct "concealed from the plaintiff the existence of a cause of action." *Cerbone v. Int'l Ladies' Garment Workers Union,* 768 F.2d 45, 48 (2d Cir.1985). To invoke this doctrine, the plaintiff need not demonstrate that the defendant was guilty of fraudulent concealment. Even his failure to provide required notice of the governing legal requirements may be a sufficient basis for tolling. *See, e.g., Valdez v. United States,* 518 F.3d 173, 182–83 (2d Cir.2008) (citing *Veltri v. Bldg. Serv. 32B–J Pension Fund,* 393 F.3d 318, 323 (2d Cir.2004)).

The evidence in this case fully justifies application of that rule here. Employers who are subject to the minimum-wage and overtime provisions of the FLSA are required to "post and keep posted a notice explaining the Act … in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy." 29 C.F.R. § 516.4. The notice must list the minimum wage and explain the tip-credit provision of the law and advise that the employer is prohibited from discriminating or retaliating against employees who seek relief under the FLSA. 29 U.S.C. § 203(m); *see, e.g., Chan,* 2007 WL 313483 at *8, **18–19.

Defendants here did not comply with this notice requirement, and made no effort to provide any other form of notice to the plaintiffs about their rights and the requirements of the FLSA. Moreover, this failure to provide notice was presumably quite intentional. Indeed, had the deliverymen known of their right to a minimum wage and of the ability of the owners to take a credit for tips, they might well have demanded higher wages, thus challenging the economic foundations of what appears to have been a very profitable enterprise that was able to pay rock-bottom wages, thus minimizing the cost of operations while providing food at relatively low prices. It was clearly the goal of defendants to minimize their labor costs and to keep a cowed work staff in place. Depriving the employees of notice of their rights appears to have been an essential part of this process, a point that is underscored by the extreme measures that defendants took when the staff began to organize and demand better pay.

---

42. By contrast, under New York law the statute of limitations is six years. N.Y. Labor Law §§ 198(3), 663(3). For reasons to be noted, however, plaintiffs will be proceeding on the minimum-wage and overtime claims only under federal law.

In sum, we conclude that the statute-of-limitations defense is inapplicable here in view of the defendants' concealment of plaintiffs' rights from them. *See, e.g., Ramirez v. CSJ & Co.*, 2007 WL 1040363, *3 (S.D.N.Y. April 3, 2007). *Accord Cortez v. Medina's Landscaping*, 2002 WL 31175471, *6 (N.D.Ill. Sept. 30, 2002). *See also Baba v. Grand Central P'ship*, 2000 WL 1808971, **2–03 (S.D.N.Y. Dec. 8, 2000).

## II. *Minimum Wage and Overtime Under New York Law*

The standards imposed by the New York Labor Law vary to some degree from those established by the FLSA. Most notably, state law provides for a reduced mandatory minimum wage for "service employees" of restaurants who receive tips. N.Y.C.R.R. tit. 12 §§ 137–3.3, 137–1.4. The same distinction is made for overtime pay. *See* N.Y.C.R.R. tit. 12 § 137–1.3.

Since New York law provides a lower rate of compensation to plaintiffs, they seek to recover under federal law if the court applies equitable tolling to the federal claims. For reasons noted, we do so hold, and accordingly do not separately address the requirements under New York law for minimum-wage and overtime claims.[43]

## IV. *Spread–of–Hours Compensation*

■ New York law contains a separate requirement that finds no analogue in federal law, and that provides a basis for recovery by plaintiffs in addition to their minimum-age and overtime claims. Under the pertinent provisions, an employee whose workday is longer than ten hours must receive one hour's pay "at the basic minimum hourly wage rate." N.Y.C.R.R. tit. 12 § 137–1.7. The measure of the workday for this purpose is the number of hours from the time the employee starts his work until he finishes, including both work time and non-working time. *Id.; see also* N.Y.C.R.R. tit. 12 § 137–3.11. *See Chan,* 2007 WL 313483 at *21 (quoting N.Y.C.R.R. tit. 12 § 142–2.4).

■ The employees' entitlement to this compensation is in addition to any claim for minimum-wage payments or overtime. *See, e.g., Yang,* 427 F.Supp.2d at 343; *Liu v. Jen Chu Fashion Corp.*, 2004 WL 33412, *2,4 (S.D.N.Y. Jan. 7, 2004). Moreover, the minimum-wage payment to which the employee is entitled under the pertinent provisions is the regular minimum wage rather than the lower wage for tipped "service employees." N.Y.C.R.R. tit. 12 § 137–1.7.

Defendants have conceded that they never paid this spread-of-hours compensation to the plaintiffs. (JPTO 6 at ¶ 8; Defs. Post-trial Mem. 8–9). They argue, rather, that plaintiffs were never entitled to such compensation because their spread of hours was never greater than seven hours. The record reflects, however, as we have previously found, that this is not the case and that most of the plaintiffs had workdays that regularly and substantially exceeded ten hours. Accordingly, those plaintiffs are entitled to spread-of-hours compensation.

## IV. *Liquidated Damages*

■ Both federal and state law provide for the payment of liquidated damages in appropriate circumstances to employees who have been denied payment of either

---

**43.** That said, it is still necessary to calculate the amount by which plaintiffs were underpaid under New York law since plaintiffs are entitled to an award of liquidated damages under New York law, and that award is statutorily set at twenty-five percent of the amount by which the defendants underpaid plaintiffs under New York law. *See* pp. 42–44, *infra.*

minimum wages or overtime. In this case plaintiffs have sufficiently demonstrated an entitlement to both awards.

 Under the FLSA, a plaintiff who demonstrates that he was improperly denied either minimum wages or overtime may recover, in addition to reimbursement of unpaid wages, an amount equal to the unpaid wages unless the employer demonstrates that it acted in good faith and had reasonable grounds for believing that it had not violated the FLSA. 29 U.S.C. §§ 216(b), 260. As the Second Circuit has observed, "the employer bears the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness.... The burden, under 29 U.S.C. § 260, is a difficult one to meet, however, and 'double damages are the norm, single damages the exception.'" *Southern New England Telecomm. Corp.*, 121 F.3d at 71 (internal quotations omitted); *accord Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir.2008); *Herman*, 172 F.3d at 142.

Defendants have failed to demonstrate that in not paying either a minimum wage or overtime they acted in good faith and reasonably believed that their actions were lawful. Quite to the contrary, as we have found, their actions evinced a knowing and deliberate disregard for their legal obligations in this respect. Hence, they have not met their burden to avoid imposition of FLSA liquidated damages. *See, e.g., Barfield*, 537 F.3d at 150 (quoting *Herman*, 172 F.3d at 142) ("To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them."); *Tlacoapa v. Carregal*, 386 F.Supp.2d 362, 368 (S.D.N.Y.2005).

 As a separate matter, the New York Labor Law authorizes an award of liquidated damages, in the amount of 25 percent of unpaid wages, if the employee demonstrates that his employer's violation was willful. N.Y. Labor Law §§ 198(1–a), 663(1). The applicable test for willfulness in this context appears to parallel that employed in determining willfulness for limitations purposes under the FLSA. *See, e.g., Moon*, 248 F.Supp.2d at 235. As noted, willfulness in that context involves either knowledge by the employer that his conduct is illegal or reckless disregard for whether it is statutorily prohibited. *See McLaughlin*, 486 U.S. at 133, 108 S.Ct. 1677.

As we have already found, plaintiffs have satisfied this requirement. At a minimum, Simon Nget and Michelle Nget showed no regard whatsoever for legal requirements in connection with their wage policies and had ample reason to know that they were failing to pay legally mandated wages to their employees. Accordingly, plaintiffs are entitled to an award of liquidated damages under the Labor Law.

 The remaining question in this regard is whether plaintiffs may receive two awards of liquidated damages, one under federal law and the other under New York law. Since the two awards serve different purposes, plaintiffs may recover both.

 Liquidated damages under the FLSA are not a penalty. Rather, they are "compensation to the employee occasioned by the delay in receiving wages caused by the employer's violation of the FLSA." *Herman*, 172 F.3d at 142. *Accord S. New England Telecomm. Corp.*, 121 F.3d at 71. Thus, they serve as a form of pre-judgment interest, and for that reason a plaintiff who prevails on his FLSA claim and receives liquidated damages may not also receive an award of interest. *See, e.g., Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 715, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).

In contrast, the liquidated damages provided for in the New York Labor Law are punitive in nature. *See, e.g., Reilly v. NatWest Mkts. Group, Inc.,* 181 F.3d 253, 265 (2d Cir.1999); *Carter v. Frito–Lay, Inc.,* 74 A.D.2d 550, 551, 425 N.Y.S.2d 115, 115 (1st Dep't 1980). Because of that distinction, a plaintiff awarded this form of damages—as distinct from liquidated damages under the FLSA—may also recover pre-judgment interest "because [they] serve fundamentally different purposes." *Reilly,* 181 F.3d at 265.

By the same reasoning, then, a prevailing plaintiff who can justify both federal liquidated damages and state-law damages should be eligible to recover both, since they also "serve fundamentally different purposes". *See, e.g., Kim v. 167 Nail Plaza,* 2008 WL 2676598, \*2–4 (S.D.N.Y. July 7, 2008); *Renteria v. Italia Foods, Inc.,* 2003 WL 21995190, \*5 (N.D.Ill. Aug.21, 2003). Accordingly, we conclude that plaintiffs may be awarded both forms of relief.[44]

## III. *Retaliation*

Wholly apart from the failure by defendants to pay minimum wages, overtime, and spread-of-hours compensation, plaintiffs press a claim that all but thirteen of them were terminated in 2007 in retaliation for their intention to pursue an FLSA complaint.[45] If proven, that conduct would constitute a separate violation of the FLSA, which states in pertinent terms that an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3).

As we have found based on the uncontradicted testimony of the plaintiffs, their allegations of retaliation are borne out by the evidence. The Ngets learned about the intention of some of their deliverymen to pursue FLSA claims [46]—just as a group of deliverymen at another establishment had recently done—and as a result they gathered the men together, offered them increased wages if they agreed not to pursue such claims, and warned them that they would be fired if they did not abandon their litigation plans. The Ngets then acted on their threat, terminating the deliverymen when none was willing to sign the paper that Simon Nget was holding up, a document that we infer constituted a waiver of claims.[47]

44. Although we are not making a separate award of back pay under New York law because it would simply duplicate a portion of the federal-law back pay award, we must calculate the amount of the underpayment under the New York Labor Law to determine the size of the liquidated-damages award.

45. The thirteen excluded plaintiffs were no longer working for Saigon Grill when defendants instituted the business-wide layoffs. These plaintiffs include Guo Qi Chen, Ming Lin, Rui Guan Xie, Shu Hua Chen, Shu Jian Chen, Wen Rui Zheng, Xiang Wei Chen, Xin Wei Lin, Xue Yong Huang, Zhao Yu Dong, Jie Chen, Wen Da Chen and Rui Hua You.

46. As the NLRB administrative law judge noted, before uttering the termination threat, Si-

mon Nget learned from two deliverymen that he was about to be sued for not paying the minimum wage, and he chose then to proceed with the threat of retaliation and the actual termination of the deliverymen. *Saigon Gourmet,* 2008 WL 449658 at second page.

47. We note that the NLRB administrative law judge came to the equivalent conclusion, *Saigon Gourmet,* 2008 WL 449658 at third and fourth pages, that defendants had engaged in retaliatory terminations, in violation of Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (protecting concerted activity for "mutual aid and protection"). *See, e.g., Eastex v. NLRB,* 437 U.S. 556, 563–78 & n. 15, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). That finding is not binding on us, but the trial

Given these findings, plaintiffs must be deemed to have prevailed on their retaliation claim under federal law. Their initial burden requires that they establish that they were engaging in protected conduct, that the employer knew of their activity, that the employer undertook action adverse to them and that that action was causally connected to the employees' protected activity. *See, e.g., Mullins v. City of New York*, 554 F.Supp.2d 483, 488 (S.D.N.Y.2008); *Lai v. Eastpoint Int'l, Inc.*, 2000 WL 1234595, *3–4 (S.D.N.Y. Aug.31, 2000). Plaintiffs have amply done so, and defendants have offered no evidence to contradict either the factual basis for the claim or the inferences to be drawn from those facts. *See, e.g., Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 874, 879 (2d Cir.1988).

■ The actions of the plaintiffs in organizing to file a lawsuit are certainly protected activities. In this regard, we note that the wording of the cited provision appears to contemplate that the protected activity will usually precede the retaliatory action, but not exclusively so since the statute prohibits retaliation targeting an employee who is "about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). As the administrative law judge found, some of the Saigon Grill deliverymen had signed authorization cards for a FLSA lawsuit before the termination threat was made, and Simon Nget was aware that the plaintiffs were in the process of preparing the suit. As other courts have done, we read the statute as covering retaliation in such circumstances. *See, e.g., E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1004–05 (9th Cir.2002)(adverse action in response to employee's stated intention to file claim constitutes retalia-

tion); *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir.1992) (retaliation established even though adverse action preceded filing of claim). *Cf. Saffels v. Rice*, 40 F.3d 1546, 1549 (8th Cir.1994).

■ As for the actions taken by the defendants, the termination of these plaintiffs was certainly adverse and was plainly undertaken in retaliation for the plaintiffs' intention to seek legal redress. Finally, to the extent that defendants suggest that the elimination of the very profitable delivery service was done for financial reasons, (S. Nget Dep. 203, 205; Defs.' Post-trial Memo at 12), there is not a shred of evidence to support this fanciful claim.

We note that this proof also establishes plaintiffs' parallel retaliation claim under state law. The pertinent provision of the Labor Law is in fact more broadly worded than the FLSA, prohibiting employers from

> discharg[ing], penaliz[ing], or in any other manner discriminat[ing] against any employee because such employee has made a complaint to his employer, or to the commissioner or his authorized representative, that the employer has violated any provision of this chapter, or because such employee has caused to be instituted a proceeding under or related to this chapter, or because such employee has testified or is about to testify in an investigation or proceeding under this chapter.

N.Y. Labor Law § 215(1). This section, unlike the federal provision, covers complaints by employees to their employer and not merely the institution of formal proceedings. Hence, even if the plaintiffs' signing of authorizations for a lawsuit and

record here dictates the same conclusion under the somewhat different provision of the FLSA.

their evident intention to testify in such a proceeding were deemed not to be covered by the FLSA, the effort by plaintiffs to obtain a raise from defendants, with the accompanying threat of a lawsuit, would clearly be protected by the Labor Law.

As for relief, as a general matter a plaintiff who prevails under the anti-retaliation provision of the FSLA may be awarded "such legal or equitable relief as may be appropriate ... including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages", 29 U.S.C. § 216(b), and possibly punitive damages. *See, e.g., Sines v. Service Corp. Int'l,* 2006 WL 3247663, \*1–4 (S.D.N.Y. Nov.8, 2006). *See also Travis v. Gary Cmty. Mental Health Ctr., Inc.,* 921 F.2d 108, 111 (7th Cir.1990). As for whether the plaintiffs' immigration status—which does not appear on the record, having been excluded by the court from this phase of the case—should affect the nature or the scope of the relief available to them, *see generally Hoffman Plastic Compounds, Inc. v. N.L.R.B.,* 535 U.S. 137, 149, 151, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (precluding back-pay award to undocumented alien who proffered false documents to an unsuspecting employer), we need not address that question at this stage since the relief portion of the retaliation claim has been bifurcated and postponed to a second stage of this proceeding.

## IV. *Which Defendants Are Liable?*

Under both federal and New York law, personal liability may be imposed on "employers".[48] The FSLA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.

§ 203(d). This term is to be broadly construed. As observed by the Second Circuit, "The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer.... Above and beyond the plain language ... the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact' in the national economy." *Herman,* 172 F.3d at 139.

■ This test rests on the "economic reality" of the relationship between the individual defendant and the business. *Id.* The court must look to such matters as whether the defendant has the power to hire and fire the employees, whether he supervises or controls their work schedule and performance, whether he determines compensation and methods of payment and whether he maintains employment records. *Id.* These factors are not exclusive, and the plaintiff need not satisfy all of them to demonstrate that a particular defendant is an employer. *See, e.g., Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 71 (2d Cir.2003).

There is no dispute that Simon Nget qualifies as an employer. Defendants have stipulated that he is "an owner of the Saigon Grill Restaurants" and that during the relevant time period he "has had the power to hire and fire employees, set wages, set terms and conditions of employment, and maintain employment records at all the Saigon Grill Restaurants." (JPTO 9 at ¶ 20). Still more to the point, they have further stipulated that, as a matter of law, he was plaintiffs' employer. (JPTO 10 at ¶ 25).

■ As for Michelle Nget, she and her husband testified that she played only a minor role and only at the West Side

---

**48.** Since New York law parallels that of the FLSA in defining the scope of the term "employer", *e.g., Jiao v. Chen,* 2007 WL 4944767,

\*9 n. 12 (S.D.N.Y. Mar. 30, 2007), we focus on caselaw interpreting the FLSA.

Saigon Grill. Supposedly she only helped out with the packing of delivery bags and checked on food quality from time to time, and had no interactions with the deliverymen. This testimony is simply not credible.

To start, she was directly involved in the setting up of the network of corporations that controlled the four restaurants. (Tr. 423–26). As for the operation of the restaurants, the plaintiffs consistently and credibly testified that she was almost invariably the person with whom they initially met when they were seeking a job and that she decided on the spot whether to hire them. They also credibly testified that she assigned them their work hours, posted the written schedule in the West Side restaurant, told them what their pay was, kept close tabs on their performance in delivering food, assigned them their side work, set quotas for them to meet in doing these tasks, imposed fines on them when she deemed their performance unsatisfactory, collected the fines or directed them to give the cash to the person at the cash register, paid them their wages in cash, instructed them to take and deposit monthly checks from the restaurant and return the cash to her or her husband, and fired them on occasion when she decided that they had poorly performed in some serious way. In addition, she had an ownership interest in the corporations and hence the business, while taking only a nominal salary of about $200.00 per week. (M. Nget Dep. 17–18; Tr. 420–21, 423–26).

Finally, we note that when the defendants decided to confront, threaten and fire the deliverymen who were complaining about their wages, Michelle Nget not only accompanied her husband to the meeting, but actively participated in it, including by threatening the workers. (PX 21 ¶ 24; PX 45 ¶ 30). There can be no clearer indication of her leading role in the business and her personal responsibility for the violation of plaintiffs' legal rights.

As for Sung Truong, the case is a closer one. He did not have the authority to set wages and apparently did not himself determine the plaintiffs' workday. Nonetheless, he exercised significant managerial authority in operating the East Side and University Place restaurants. He apparently had the authority to terminate employees, and to impose sanctions. He also assigned their work, including specifying what side work they were to do, and he actually paid them. We infer as well that he maintained the books and records of the two restaurants that he managed. Moreover, it is plain that he understood the conditions under which plaintiffs were working, including their wages, and readily lent himself to, and facilitated, a system under which they were denied their rights under federal and state law. In sum, the economic realities suggest that he was an employer within the meaning of the FLSA and state law.

The remaining individual defendant is Leana Nget, who is a sister of Simon Nget. The evidence as to her role was fairly sketchy and did not suggest that she had any meaningful decisional authority over the operations of the restaurants. Although she apparently assigned the deliverymen specific side work during periods when her brother and Michelle Nget were not at the West Side restaurant, this alone is not sufficient to justify imposing liability on her for the managerial decisions that denied plaintiffs their rights.

## V. The Awards

Finally, we turn to the calculation of awards based on the foregoing findings. That process is fairly straightforward. We have credited the testimony of the plaintiffs, found in their affidavits and live testimony, regarding the number of hours

that they worked and the wages that they were paid. Defendants have not sought to dispute plaintiffs' account of their wages. As for their work hours, the only real dispute is a result of defendants' suggestion that plaintiffs were not required to work for a portion of the time when they were at the job site, and for reasons already noted, we have rejected defendants' contentions in that respect.

Having adopted plaintiffs' testimony about their wages and hours, we are left to calculate the extent to which those wages represent underpayment of the minimum wage and overtime under federal and New York law, as well as unpaid spread-of-

hours wages, and must then determine the amount of liquidated damages under both federal and New York law.

At the direction of the court, plaintiffs undertook those calculations. (*See* Pls.' Ex. A to their post-trial memorandum of law). Notably, defendants in response have not quarreled with the math, and instead simply argue—albeit without any evidentiary support—that plaintiffs' wages were consistent with legal requirements.

We adopt the plaintiffs' undisputed calculations [49] and thus award plaintiffs the following (with citations to the record for hours, wages, and expenses):

---

**49.** We have rechecked counsel's calculations for a number of plaintiffs and have thereby confirmed their accuracy.

### 1. Bao Guo Xie:

*Wages* (PX 14, ¶¶ 7–11)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 55,515.66 |
| Liquidated Damages (FLSA) | — | $ 55,515.66 |
| Spread-of-Hours Claim (NY) [50] | — | $ 993.21 |
| Total | | $112,024.53 |

*Bicycle Claim* (PX 14, ¶¶ 20–22)

| | | |
|---|---|---|
| Bicycle Purchases and Repairs | — | $ 9,185.15 |
| Liquidated Damages (FLSA) | — | $ 9,185.15 |
| Total | | $ 18,370.30 |

*Fines Claim* (PX 14 ¶ 24)

| | | |
|---|---|---|
| Fines | — | $ 220.00 |
| Liquidated Damages (FLSA) | — | $ 220.00 |
| Total | | $ 440.00 |

*Deductions (Kickback) Claim* (PX 14 ¶ 16)

| | | |
|---|---|---|
| Deductions | — | $ 1,555.99 |
| Liquidated Damages (FLSA) | — | $ 1,555.99 |
| Total | | $ 3,111.98 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $37,570.28 | — | $ 9,392.58 |

### 2. Bao Jian Chen

*Wages* (PX 15 ¶ 7)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 72,543.73 |
| Liquidated Damages | — | $ 72,543.73 |
| Spread-of-Hours Claim | — | $ 8,444.46 |
| Total | | $153,531.92 |

*Bicycle Claim* (PX 15 ¶¶ 17–18)

| | | |
|---|---|---|
| Bicycle Purchases and Repairs | — | $ 1,379.01 |
| Liquidated Damages (FLSA) | — | $ 1,379.01 |
| Total | | $ 2,758.02 |

*Fines Claim* (PX 15 ¶ 20)

| | | |
|---|---|---|
| Fines | — | $ 20.00 |
| Liquidated Damages (FLSA) | — | $ 20.00 |
| Total | | $ 40.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $46,749.26 | — | $ 11,687.31 |

**50.** The amount awarded on this claim for each plaintiff includes liquidated damages under New York law.

### 3. Bing Xing Li

*Wages* (PX 16 ¶ 7)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ | 9,512.30 |
| Liquidated Damages (FLSA) | — | $ | 9,512.30 |
| Spread-of-Hours Claim (NY) | — | $ | 991.71 |
| | Total | $ | 20,016.31 |

*Motorbike Claim* (PX 16 ¶¶ 16–17)

| | | | |
|---|---|---|---|
| Motorbike Purchases and Repairs | — | $ | 4,209.59 |
| Liquidated Damages (FLSA) | — | $ | 4,209.59 |
| | Total | $ | 8,419.18 |

*Deductions (Kickback) Claim* (PX 16 ¶ 12)

| | | | |
|---|---|---|---|
| Deductions | — | $ | 534.25 |
| Liquidated Damages (FLSA) | — | $ | 534.25 |
| | Total | $ | 1,068.50 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $11,208.15 | — | $ | 2,802.04 |

### 4. De Qui Xie

*Wages* (Trial Tr. 83–87)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $118,626.63 |
| Liquidated Damages (FLSA) | — | $118,626.63 |
| Spread-of-Hours Claim | — | $ 12,155.46 |
| | Total | $249,408.72 |

*Bicycle & Motorbike Claims* (Trial Tr. 98)

| | | | |
|---|---|---|---|
| Bicycle & Motorbike Purchases & Repairs | — | $ | 5,089.49 |
| Liquidated Damages (FLSA) | — | $ | 5,089.49 |
| | Total | $ | 10,178.98 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| Total NY (25% × $83,233.16) | — | $ | 20,808.29 |

### 5. De Shun Chi

*Wages* (PX 18 ¶¶ 6–8)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $117,512.18 |
| Liquidated Damages (FLSA) | — | $117,512.18 |
| Spread-of-Hours Claim (NY) | — | $ 12,877.39 |
| | Total | $247,901.75 |

*Bicycle Claim*

| | | | |
|---|---|---|---|
| Bicycle Purchases and Repairs | — | $ | 1,985.95 |
| Liquidated Damages (FLSA) | — | $ | 1,985.95 |
| | Total | $ | 3,971.90 |

*New York Liquidated Damages*

| | | | |
|---|---|---|---|
| 25% × $75,500.65 | — | $ | 18,875.17 |

### 6. Guo Jin Chen

*Wages* (PX 19 ¶¶ 17–19)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 50,899.83 |
| Liquidated Damages (FLSA) | | — | $ 50,899.83 |
| | Total | | $101,799.66 |

*Motorbike Claim* (PX 19 ¶¶ 18–19)

| | | | |
|---|---|---|---|
| Motorbike Purchases and Repairs | | — | $ 14,986.14 |
| Liquidated Damages (FLSA) | | — | $ 14,986.14 |
| | Total | | $ 29,972.28 |

*Fines Claim* (PX 19 ¶ 2)

| | | | |
|---|---|---|---|
| Fines | | — | $ 110.00 |
| Liquidated Damages (FLSA) | | — | $ 110.00 |
| | Total | | $ 220.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $43,613.15 | | — | $ 10,903.28 |

### 7. Guo Qi Chen

*Wages* (PX 20 ¶¶ 6–8)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 47,740.46 |
| Liquidated Damages (FLSA) | | — | $ 47,740.46 |
| Spread-of-Hours Claim (NY) | | — | $ 5,457.21 |
| | Total | | $100,938.13 |

*Bicycle Claim* (PX 20 ¶¶ 15–16)

| | | | |
|---|---|---|---|
| Bicycle Purchases and Repairs | | — | $ 339.53 |
| Liquidated Damages (FLSA) | | — | $ 339.53 |
| | Total | | $ 679.06 |

*Fines Claim* (PX 20 ¶ 17)

| | | | |
|---|---|---|---|
| Fines | | — | $ 20.00 |
| Liquidated Damages (FLSA) | | — | $ 20.00 |
| | Total | | $ 40.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $30,048.31 | | — | $ 7,512.08 |

8. **Jian Le Lin**

*Wages* (PX 21 ¶¶ 6–7)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ | 55,988.17 |
| Liquidated Damages (FLSA) | — | $ | 55,988.17 |
| Spread-of-Hours Claim (NY) | — | $ | 6,099.80 |
| | Total | | $118,076.14 |

*Motorbike Claim* (PX 21 ¶¶ 17–18)

| | | | |
|---|---|---|---|
| Motorbike Purchases & Repairs | — | $ | 5,668.63 |
| Liquidated Damages (FLSA) | — | $ | 5,668.63 |
| | Total | | $ 11,337.26 |

*Fines Claim* (PX 21 ¶ 19)

| | | | |
|---|---|---|---|
| Fines | — | $ | 20.00 |
| Liquidated Damages (FLSA) | — | $ | 20.00 |
| | Total | | $ 40.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $43,053.09 | — | $ | 10,763.28 |

9. **Jian Yun Chen**

*Wages* (PX 22 ¶¶ 6–9)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $147,745.54 |
| Liquidated Damages (FLSA) | — | $147,745.54 |
| Spread-of-Hours Claim (NY) | — | $ 14,261.21 |
| | Total | $309,752.29 |

*Bicycle & Motorbike Claims* (PX 22 ¶¶ 18–19)

| | | |
|---|---|---|
| Bicycle/Motorbike Purchases & Repairs | — | $ 10,175.92 |
| Liquidated Damages (FLSA) | — | $ 10,175.92 |
| | Total | $ 20,351.84 |

*Fines Claim* (PX 22 ¶ 21)

| | | | |
|---|---|---|---|
| Fines | — | $ | 600.00 |
| Liquidated Damages (FLSA) | — | $ | 600.00 |
| | Total | | $ 1,200.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $106,760.08 | — | $ | 26,690.02 |

10. **Jie Chen**

*Wages* (PX 23 ¶ 6)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim | — | $ | 16,451.54 |
| Liquidated Damages (FLSA) | — | $ | 16,451.54 |
| | Total | $ | 32,903.08 |

*Bicycle Claim* (PX 23 ¶¶ 13–14)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | — | $ | 1,658.14 |
| Liquidated Damages (FLSA) | — | $ | 1,658.14 |
| | Total | $ | 3,316.28 |

*Fines Claim* (PX 23 ¶ 15)

| | | | |
|---|---|---|---|
| Fines | — | $ | 40.00 |
| Liquidated Damages (FLSA) | — | $ | 40.00 |
| | Total | $ | 80.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $11,018.59 | — | $ | 2,754.64 |

11. **Li Qiang Lin**

*Wages* (PX 24 ¶¶ 7–10)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ | 61,432.70 |
| Liquidated Damages (FLSA) | — | $ | 61,432.70 |
| Spread-of-Hours Claim (NY) | — | $ | 6,689.28 |
| | Total | | $129,554.68 |

*Bicycle Claim* (PX 24 ¶ 20)

| | | | |
|---|---|---|---|
| Bicycle Repairs | — | $ | 910.68 |
| Liquidated Damages (FLSA) | — | $ | 910.68 |
| | Total | $ | 1,821.36 |

*Fines Claim* (PX 24 ¶ 21)

| | | | |
|---|---|---|---|
| Fines | — | $ | 20.00 |
| Liquidated Damages (FLSA) | — | $ | 20.00 |
| | Total | $ | 40.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $39,535.74 | — | $ | 9,883.94 |

12. **Lian Guan Chi**

*Wages* (PX 25 ¶¶ 6–8; Trial Tr. 383)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 71,162.60 |
| Liquidated Damages (FLSA) | — | $ 71,162.60 |
| Spread-of-Hours Claim (NY) | — | $ 8,867.50 |
| | Total | $151,192.70 |

 *Bicycle & Motorbike Claims* (PX 25 ¶¶ 17–18)

| | | |
|---|---|---|
| Bicycle & Motorbike Purchase & Repair | — | $ 5,265.48 |
| Liquidated Damages (FLSA) | — | $ 5,265.48 |
| | Total | $ 10,530.96 |

 *Fines Claim* (PX 25 ¶ 19)

| | | |
|---|---|---|
| Fines | — | $ 300.00 |
| Liquidated Damages (FLSA) | — | $ 300.00 |
| | Total | $ 600.00 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---|
| NY Total (25% × $49,059.07) | — | $ 12,264.77 |

13. **Ming Hua Chen**

*Wages* (PX 26 ¶ 7)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 9,749.87 |
| Liquidated Damages (FLSA) | — | $ 9,749.87 |
| | Total | $ 19,499.74 |

 *Bicycle Claim* (PX 26 ¶¶ 15–16)

| | | |
|---|---|---|
| Bicycle Purchase & Repair | — | $ 532.88 |
| Liquidated Damages (FLSA) | — | $ 532.88 |
| | Total | $ 1,065.76 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---|
| NY Total (25% × $5,405.34) | — | $ 1,351.34 |

14. **Ming Lin**

*Wages* (PX 27 ¶ 6)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 6,763.35 |
| Liquidated Damages (FLSA) | — | $ 6,763.35 |
| | Total | $ 13,526.70 |

 *Bicycle Claim* (PX 27 ¶ 14)

| | | |
|---|---|---|
| Bicycle Repairs | — | $ 178.75 |
| Liquidated Damages (FLSA) | — | $ 178.75 |
| | Total | $ 357.50 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $3,724.47 | — | $ 931.12 |

### 15. Mu Lei Xie

*Wages*　(PX 28 ¶¶ 6–8)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 81,381.11 |
| Liquidated Damages (FLSA) | | — | $ 81,381.11 |
| Spread-of-Hours Claim (NY) | | — | $ 9,900.67 |
| | Total | | $172,662.89 |

　*Bicycle Claim*　(PX 28 ¶¶ 16–17)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 2,501.24 |
| Liquidated Damages (FLSA) | | — | $ 2,501.24 |
| | Total | | $ 5,002.48 |

　*Fines Claim*　(PX 28 ¶ 18)

| | | | |
|---|---|---|---|
| Fines | | — | $ 80.00 |
| Liquidated Damages (FLSA) | | — | $ 80.00 |
| | Total | | $ 160.00 |

　*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $54,071.86 | | — | $ 13,517.97 |

### 16. Qi Hua Lian

*Wages*　(PX 29 ¶ 8)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 63,771.02 |
| Liquidated Damages (FLSA) | | — | $ 63,771.02 |
| Spread-of-Hours Claim (NY) | | — | $ 5,957.25 |
| | Total | | $133,499.29 |

　*Bicycle Claim*　(PX 29 ¶¶ 17–18)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 708.60 |
| Liquidated Damages (FLSA) | | — | $ 708.60 |
| | Total | | $ 1,417.20 |

　*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $43,895.85 | | — | $ 10,973.96 |

### 17. Qiang Hua Li

*Wages*　(PX 30 ¶ 7)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 15,245.26 |
| Liquidated Damages (FLSA) | | — | $ 15,245.26 |
| | Total | | $ 30,490.52 |

　*Bicycle Claim*　(PX 30 ¶¶ 15–16)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs (FLSA) | | — | $ 769.28 |
| Liquidated Damages (FLSA) | | — | $ 769.28 |
| | Total | | $ 1,538.56 |

　*Deduction (Kickback) Claim*　(PX 30 ¶ 11)

| | | | |
|---|---|---|---|
| Deductions | | — | $ 323.51 |
| Liquidated Damages (FLSA) | | — | $ 323.51 |
| | Total | | $ 647.02 |

　*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $8,504.32 | | — | $ 2,126.08 |

18. **Rui Guan Xie**

*Wages* (PX 31 ¶ 7)

| | | | |
|---|---|---|---:|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 42,139.39 |
| Liquidated Damages (FLSA) | | — | $ 42,139.39 |
| Spread-of-Hours Claim (NY) | | — | $ 4,193.57 |
| | Total | | $ 88,472.35 |

 *Bicycle Claim* (PX 31 ¶¶ 15–16)

| | | | |
|---|---|---|---:|
| Bicycle Purchase and Repairs | | — | $ 715.89 |
| Liquidated Damages (FLSA) | | — | $ 715.89 |
| | Total | | $ 1,431.78 |

 *Fines Claim* (PX 31 ¶ 17)

| | | | |
|---|---|---|---:|
| Fines | | — | $ 20.00 |
| Liquidated Damages (FLSA) | | — | $ 20.00 |
| | Total | | $ 40.00 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---:|
| 25% × $28,261.40 | — | $ 7,065.35 |

19. **Rui Hua You**

*Wages* (PX 50 ¶ 4)

| | | | |
|---|---|---|---:|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 26,932.52 |
| Liquidated Damages (FLSA) | | — | $ 26,932.52 |
| Spread-of-Hours Claim (NY) | | — | $ 3,945.27 |
| | Total | | $ 57,810.31 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---:|
| 25% × $16,326.51 | — | $ 4,081.63 |

20. **Shu Hua Chen**

*Wages* (PX 33 ¶¶ 6–9)

| | | | |
|---|---|---|---:|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 84,430.50 |
| Liquidated Damages (FLSA) | | — | $ 84,430.50 |
| Spread-of-Hours Claim (NY) | | — | $ 10,116.27 |
| | Total | | $178,977.27 |

 *Bicycle Claim* (PX 33 ¶¶ 17–18)

| | | | |
|---|---|---|---:|
| Bicycle Purchases & Repairs | | — | $ 2,518.66 |
| Liquidated Damages (FLSA) | | — | $ 2,518.66 |
| | Total | | $ 5,037.32 |

 *Fines Claim* (PX 33 ¶ 19)

| | | | |
|---|---|---|---:|
| Fines (PX 33 ¶ 19) | | — | $ 110.00 |
| Liquidated Damages (FLSA) | | — | $ 110.00 |
| | Total | | $ 220.00 |

 *New York Liquidated Damages Claim*

| | | |
|---|---|---:|
| 25% × $57,354.69 | — | $ 14,338.68 |

### 21. Shu Hui Chen

*Wages* (PX 34 ¶¶ 7–9)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 83,985.35 |
| Liquidated Damages Claim (FLSA) | | — | $ 83,985.35 |
| Spread-of-Hours Claim | | — | $ 6,416.54 |
| | Total | | $174,387.24 |

*Motorbike Claim* (PX 34 ¶¶ 18–19)

| | | | |
|---|---|---|---|
| Motorbike Purchases & Repairs | | — | $ 11,647.32 |
| Liquidated Damages (FLSA) | | — | $ 11,647.32 |
| | Total | | $ 23,294.64 |

*Fines Claim* (PX 34 ¶ 20)

| | | | |
|---|---|---|---|
| Fines | | — | $ 110.00 |
| Liquidated Damages (FLSA) | | — | $ 110.00 |
| | Total | | $ 220.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $66,271.49 | — | $ 16,567.87 |

### 22. Shu Jian Chen

*Wages* (PX 35 ¶¶ 7–8)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 25,114.72 |
| Liquidated Damages (FLSA) | | — | $ 25,114.72 |
| Spread-of-Hours Claim (NY) | | — | $ 3,012.75 |
| | Total | | $ 53,242.19 |

*Bicycle Claim* (PX 35 ¶¶ 16–17)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 481.79 |
| Liquidated Damages (FLSA) | | — | $ 481.79 |
| | Total | | $ 963.58 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $15,772.54 | — | $ 3,943.14 |

### 23. Shu Jin Chen

*Wages* (PX 50 ¶¶ 1–3)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 3,344.03 |
| Liquidated Damages (FLSA) | | — | $ 3,344.03 |
| Spread-of-Hours Claim (NY) | | — | $ 4,322.32 |
| | Total | | $ 11,010.38 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| NY Total (25% × $3,344.03) | — | $ 836.01 |

### 24. Wen Da Chen

*Wages* (PX 37 ¶¶ 7–9)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 50,955.48 |
| Liquidated Damages (FLSA) | | — | $ 50,955.48 |
| Spread-of-Hours Claim (NY) | | — | $ 6,373.13 |
| | Total | | $108,284.09 |

*Bicycle Claim* (PX 37 ¶¶ 17–18)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 1,217.96 |
| Liquidated Damages (FLSA) | | — | $ 1,217.96 |
| | Total | | $ 2,435.92 |

*Fines Claim* (PX 37 ¶ 20)

| | | | |
|---|---|---|---|
| Fines | | — | $ 140.00 |
| Liquidated Damages (FLSA) | | — | $ 140.00 |
| | Total | | $ 280.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $33,566.37 | | — | $ 8,391.59 |

### 25. Wen Rui Zheng

*Wages* (PX 38 ¶¶ 6–7)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 52,845.71 |
| Liquidated Damages (FLSA) | | — | $ 52,845.71 |
| Spread-of-Hours Claim (NY) | | — | $ 6,721.71 |
| | Total | | $112,413.13 |

*Bicycle Claim* (PX 38 ¶¶ 17–18)

| | | | |
|---|---|---|---|
| Bicycle Purchases and Repairs | | — | $ 2,308.49 |
| Liquidated Damages (FLSA) | | — | $ 2,308.49 |
| | Total | | $ 4,616.98 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $35,780.86 | | — | $ 8,945.21 |

### 26. Wen Zhong Chen

*Wages*[51] (PX 39 ¶¶ 8–9; Trial Tr. 205)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 83,314.71 |
| Liquidated Damages (FLSA) | | — | $ 83,314.71 |
| Spread-of-Hours Claim (NY) | | — | $ 14,310.38 |
| | Total | | $180,939.80 |

*Bicycle Claim* (PX 39 ¶¶ 20, 23)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 389.15 |
| Liquidated Damages (FLSA) | | — | $ 389.15 |
| | Total | | $ 778.30 |

*Fines Claim* (PX 39 ¶ 23)

| | | | |
|---|---|---|---|
| Fines | | — | $ 50.00 |
| Liquidated Damages (FLSA) | | — | $ 50.00 |
| | Total | | $ 100.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $58,062.33 | | — | $ 14,515.58 |

### 27. Xiang Wei Cheng

*Wages* (PX 40 ¶ 6)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 4,082.52 |
| Liquidated Damages (FLSA) | | — | $ 4,082.52 |
| | Total | | $ 8,165.04 |

*Bicycle Claim* (PX 40 ¶¶ 15–16)

| | | | |
|---|---|---|---|
| Bicycle Purchases and Repairs | | — | $ 341.37 |
| Liquidated Damages Claim (FLSA) | | — | $ 341.37 |
| | Total | | $ 682.74 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $2,328.29 | | — | $ 582.07 |

---

**51.** Plaintiff Wen Zhong Chen worked as both a deliveryman and a kitchen helper. In the latter position he earned $1004.00 monthly. The calculations leading to his award are based on his work times and compensation for both of these positions. The overtime owed was calculated based on allocation of the number of hours worked beyond 40 hours on a *pro rata* basis between the two jobs, pursuant to 29 C.F.R. § 778.115.

### 28. Xian Yi Chen

*Wages* (PX 41 ¶¶ 6–9)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 89,068.98 |
| Liquidated Damages Claim (FLSA) | — | $ 89,068.98 |
| Spread-of-Hours Claim (NY) | — | $ 10,490.88 |
| | Total | $188,628.84 |

*Bicycle Claim* (PX 41 ¶¶ 18–19)

| | | |
|---|---|---|
| Bicycle Purchases & Repairs | — | $ 5,374.35 |
| Liquidated Damages Claim (FLSA) | — | $ 5,374.35 |
| | Total | $ 10,748.70 |

*Fines Claim* (PX 41 ¶ 20)

| | | |
|---|---|---|
| Fines | — | $ 150.00 |
| Liquidated Damages (FLSA) | — | $ 150.00 |
| | Total | $ 300.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $61,669.14 | — | $ 15,417.29 |

### 29. Xin Wei Lin

*Wages* (PX 42 ¶¶ 6–7)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 39,786.00 |
| Liquidated Damages (FLSA) | — | $ 39,786.00 |
| Spread-of-Hours Claim (NY) | — | $ 5,163.38 |
| | Total | $ 84,735.38 |

*Bicycle Claim* (Trial Tr. 142)

| | | |
|---|---|---|
| Bicycle Purchases & Repairs | — | $ 1,460.96 |
| Liquidated Damages Claim (FLSA) | — | $ 1,460.96 |
| | Total | $ 2,921.92 |

*Fines Claim* (PX 42 ¶ 17)

| | | |
|---|---|---|
| Fines | — | $ 60.00 |
| Liquidated Damages (FLSA) | — | $ 60.00 |
| | Total | $ 120.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $25,105.69 | — | $ 6,276.42 |

### 30. Xue Yong Huang

*Wages* (PX 43 ¶¶ 8–10)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 41,393.22 |
| Liquidated Damages (FLSA) | — | $ 41,393.22 |
| Spread-of-Hours Claim (NY) | — | $ 2,528.84 |
| | Total | $ 85,315.28 |

*Bicycle & Motorbike Claims* (PX 43 ¶¶ 18–19)

| | | |
|---|---|---|
| Bicycle/Motorbike Purchases & Repairs | — | $ 6,007.78 |
| Liquidated Damages (FLSA) | — | $ 6,007.78 |
| | Total | $ 12,015.56 |

*Fines Claim* (PX 43 ¶ 21)

| | | |
|---|---|---|
| Fines | — | $ 60.00 |
| Liquidated Damages (FLSA) | — | $ 60.00 |
| | Total | $ 120.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $31,999.78 | — | $ 7,999.95 |

### 31. Yi Lan Lin

*Wages* (PX 44 ¶ 7)

| | | |
|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ 29,252.14 |
| Liquidated Damages (FLSA) | — | $ 29,252.14 |
| Spread-of-Hours (NY) | — | $ 3,482.14 |
| | Total | $ 61,986.42 |

*Bicycle Claim* (PX 44 ¶¶ 17–18)

| | | |
|---|---|---|
| Bicycle Purchases & Repairs | — | $ 953.51 |
| Liquidated Damages (FLSA) | — | $ 953.51 |
| | Total | $ 1,907.02 |

*Fines Claim* (PX 44 ¶ 19)

| | | |
|---|---|---|
| Fines | — | $ 40.00 |
| Liquidated Damages (FLSA) | — | $ 40.00 |
| | Total | $ 80.00 |

*New York Liquidated Damages Claim*

| | | |
|---|---|---|
| 25% × $19,520.02 | — | $ 4,880.01 |

### 32. Yu Guan Ke

*Wages* (PX 45 ¶¶ 7–11)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ | 52,576.74 |
| Liquidated Damages (FLSA) | — | $ | 52,576.74 |
| Spread-of-Hours (NY) | — | $ | 331.07 |
| | Total | | $105,484.55 |

*Bicycle Claim* (PX 45 ¶¶ 21–22)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | — | $ | 2,971.95 |
| Liquidated Damages (FLSA) | — | $ | 2,971.95 |
| | Total | | $ 5,943.90 |

*Fines Claim* (PX 45 ¶ 23)

| | | | |
|---|---|---|---|
| Fines | — | $ | 200.00 |
| Liquidated Damages (FLSA) | — | $ | 200.00 |
| | Total | | $ 400.00 |

*Deductions (Kickback) Claim* (PX 45 ¶ 16)

| | | | |
|---|---|---|---|
| Deductions | — | $ | 1,039.89 |
| Liquidated Damages (FLSA) | — | $ | 1,039.89 |
| | Total | | $ 2,079.78 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $25,189.05 | — | $ | 6,297.26 |

### 33. Yu Ming Yu

*Wages* (PX 46 ¶¶ 8–9)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | — | $ | 11,000.47 |
| Liquidated Damages (FLSA) | — | $ | 11,000.47 |
| | Total | | $ 22,000.94 |

*Motorbike Claim* (PX 46 ¶¶ 19–20; Trial Tr. 312–13)

| | | | |
|---|---|---|---|
| Motorbike Purchase & Expenses | — | $ | 865.48 |
| Liquidated Damages (FLSA) | — | $ | 865.48 |
| | Total | | $ 1,730.96 |

*Deductions (Kickback) Claim* (PX 46 ¶ 14)

| | | | |
|---|---|---|---|
| Deductions | — | $ | 159.78 |
| Liquidated Damages (FLSA) | — | $ | 159.78 |
| | Total | | $ 319.56 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $7,056.54 | — | $ | 1,764.14 |

### 34. Yu Xing Zhou

*Wages* (PX 47 ¶¶ 7–10)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime (FLSA) | | — | $ 65,752.94 |
| Liquidated Damages (FLSA) | | — | $ 65,752.94 |
| Spread-of-Wages (NY) | | — | $ 2,008.50 |
| | Total | | $133,514.38 |

*Bicycle/Motorbike Claims* (PX 47 ¶¶ 19–20)

| | | | |
|---|---|---|---|
| Bicycle/Motorbike Purchases & Repairs | | — | $ 8,278.27 |
| Liquidated Damages (FLSA) | | — | $ 8,278.27 |
| | Total | | $ 16,556.54 |

*Fines Claim* (PX 47 ¶ 22)

| | | | |
|---|---|---|---|
| Fines | | — | $ 20.00 |
| Liquidated Damages (FLSA) | | — | $ 20.00 |
| | Total | | $ 40.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $42,306.07 | | — | $ 10,576.52 |

### 35. Zhao Yu Dong

*Wages* (PX 48 ¶ 7)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $ 5,978.88 |
| Liquidated Damages (FLSA) | | — | $ 5,978.88 |
| | Total | | $ 11,957.76 |

*Bicycle Claim* (PX 48 ¶¶ 15–16)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 739.34 |
| Liquidated Damages (FLSA) | | — | $ 739.34 |
| | Total | | $ 1,478.68 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $3,484.34 | | — | $ 871.09 |

### 36. Zhi Gui Xie

*Wages* (Trial Tr. 24–32)

| | | | |
|---|---|---|---|
| Minimum Wage & Overtime Claim (FLSA) | | — | $141,870.19 |
| Liquidated Damages (FLSA) | | — | $141,870.19 |
| Spread-of-Hours (NY) | | — | $ 14,930.71 |
| | Total | | $298,671.09 |

*Bicycle Claim* (Trial Tr. 63–64)

| | | | |
|---|---|---|---|
| Bicycle Purchases & Repairs | | — | $ 3,190.91 |
| Liquidated Damages (FLSA) | | — | $ 3,190.91 |
| | Total | | $ 6,381.82 |

*Fines Claim* (Trial Tr. 47–48)

| | | | |
|---|---|---|---|
| Fines | | — | $ 40.00 |
| Liquidated Damages (FLSA) | | — | $ 40.00 |
| | Total | | $ 80.00 |

*New York Liquidated Damages Claim*

| | | | |
|---|---|---|---|
| 25% × $92,599.15 | | — | $ 23,149.79 |

## CONCLUSION

For the reasons noted, judgment will be entered in favor of plaintiffs on the terms indicated on all claims except for the retaliation claims. As to those claims, we find that defendants Simon Nget, Michelle Nget, Saigon Gourmet and Restaurant Inc. Saigon Spice, Inc. are liable to those plaintiffs currently asserting claims for retaliatory termination, but a determination of relief must await further proceedings. We accordingly direct that counsel for the parties attend a status conference with the court on November 17, 2008 at 10 a.m. in Courtroom 17D.